UNITED STATES of America,

v.

Michael MURPHY & Michael Webster, Defendants.

No. 8:10–CR–312.

United States District Court, N.D. New York.

April 19, 2011.

United States Attorney–Plattsburgh Office, Of Counsel: Daniel C. Gardner, Esq., Plattsburgh, NY, for United States of America.

Luibrand Law Firm, PLLC, Of Counsel: Kevin A. Luibrand, Esq., Latham, NY, for Defendant Murphy.

Office of the Federal Public Defender–Albany Office, Of Counsel: Timothy E. Austin, Esq., Albany, NY, for Defendant Webster.

## *MEMORANDUM–DECISION & ORDER*

DAVID N. HURD, District Judge.

### I. *INTRODUCTION*

Defendants Michael Murphy ("Murphy") and Michael Webster ("Webster") (collectively "defendants") are charged in a one count indictment with conspiracy to possess with the intent to distribute and to distribute a controlled substance beginning in May 2010 and continuing up to and including June 2, 2010, in violation of Title 21, United States Code, Section 841(a)(1). Defendants have made motions pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C) to suppress the evidence seized during the search of the vehicle Webster was driving and to suppress statements made by both Murphy and Webster on June 2, 2010. Defendant Webster also moves pursuant to Federal Rule of Criminal Procedure 14(a) to sever the defendants for trial. The United States of America (the "Government") opposes defendants' motions.

A suppression hearing was held over two days on December 21, 2010, and January 11, 2011, in Utica, New York. After the hearing the parties were afforded time to review a transcript of the proceedings and submit their proposed findings of fact and conclusions of law. Those submissions have been received and reviewed together with the transcript.[1]

### II. *BURDENS OF PRODUCTION AND PROOF*

In Fourth and Fifth Amendment litigation, regardless of which party bears the ultimate burden, the standard is proof by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974) (Fourth Amendment); *Lego v. Twomey,* 404 U.S. 477, 488–89, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972) (Fifth Amendment). As the party seeking to suppress, the defendant carries the burden of production and persuasion. *See, e.g., United States v. Arboleda,* 633 F.2d 985, 989 (2d Cir.1980) (Fourth Amendment); *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986) (Fifth Amendment); *United States v. Mathurin,* 148 F.3d 68, 69 (2d Cir.1998) (same). Once the movant establishes some basis for the suppression motion, for example a search or seizure conducted without a warrant, the burden of proof shifts to the Government. *Arboleda,* 633 F.2d at 989; *United States v. Allen,* 289 F.Supp.2d 230, 242 (N.D.N.Y.2003) (Munson, J.). The Government then carries the burden to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment. *Arboleda,* 633 F.2d at 989.

### III. *FINDINGS OF FACT*

On June 2, 2010, at approximately 5:50 p.m., Webster was driving a gray 2002 Honda Accord eastbound on Kansas Interstate 70 ("I–70"), in Alma, Kansas with

---

1. All references to the transcript of the suppression hearing held on December 21, 2010, will be cited as "T1–[page # ]." All references to the transcript of the suppression hearing held on January 11, 2011, will be cited as "T2–[page # ]." All exhibits will be referred to as "Ex. G–[exhibit # ]" for the Government's exhibits, "Ex. D–[exhibit # ]" for defendant Murphy's exhibits, and "Ex. DW–[exhibit # ]" for defendant Webster's exhibits.

Murphy as a front seat passenger. Kansas Highway Patrol ("KHP") Trooper David Stahl ("Trooper Stahl") was on duty in a marked KHP police vehicle. All KHP police vehicles are equipped with mobile video and audio recording ("MVR") equipment. The vehicle he was driving that day had an MVR unit positioned between the front windshield and dashboard.

According to Trooper Stahl, the KHP drug interdiction team utilizes ruse drug checkpoint signs to create an illusion that a drug checkpoint exists beyond I–70 east Exit 322 ("Exit 322" or "322"). He testified that KHP often conducts interdiction operations at I–70 Exit 322 because there are no gas stations, hotels, restaurants, or other attractions in the area, nor signs at Exit 322 indicating that there are any, and the only buildings in the area are residential housing and the roads leading north and south of the exit become dirt roads. He testified that the lack of attractions increases the likelihood that motorists exiting the highway at Exit 322 are attempting to avoid the drug checkpoint.

On June 2, 2010, prior to the incident at issue, Trooper Stahl placed drug ruse signs west of Exit 322 facing vehicles traveling eastbound on I–70 as part of his assignment on the drug interdiction team. He then parked his patrol vehicle in a highway department turnaround lane ("turnaround") that connected I–70 east with I–70 west. The turnaround was located east of I–70 Exit 322 east for Tallgrass Road. His vehicle was facing east, in the same direction the Honda Accord was traveling.

Will Downing ("Mr. Downing"), Director of Video Productions for KHP, testified by stipulated declaration regarding how the MVR units operate. He testified that the MVR units record footage directly onto a DVD in the MVR unit and also contain a hard drive. *See* Ex. DW–9. According to

Mr. Downing, the MVR equipment is configured to "auto-record" on the happening of the following events: 1) emergency lights activation; 2) emergency siren activation; 3) wireless microphone activation; and 4) crash detection. In addition, recording can also be manually initiated by the push of the record button when none of the "auto-record" events have occurred. The MVR units are not configured to enable officers to prevent the unit from recording when the emergency lights, sirens, or wireless microphone have been activated, or to turn the recording off while keeping the emergency lights, sirens, or wireless microphone on. An MVR unit will terminate recording when the emergency lights, sirens, and wireless microphone have been turned off.

Additionally, the MVR units allow for "pre-event recording." The hard drive continuously captures footage even when the record function has not been automatically or manually activated. The result is that whenever an "auto-record" event happens, the footage actually recorded to the DVD will include video without audio for approximately 30 seconds before the event that triggered the "auto-record." An example of this is whenever an officer activates the front or top emergency lights, the recording on the DVD will depict whatever was in view of the camera starting from the point approximately 30 seconds before the emergency lights were activated, recording continuously through the point when the emergency lights were activated until the lights are turned off and the recording thus terminated.

Trooper Stahl first testified that after parking in the turnaround, he turned his *rear* emergency lights on so that traffic driving east toward him could see his lights. The lights in conjunction with the drug checkpoint signs were meant to add to the ruse. T1–16. He later testified that

he turned his *front* emergency lights on as he pulled into the turnaround to alert people to the fact that he was pulling into the turnaround. T1–151–53. A 20 second long clip recorded by his MVR unit was introduced at the suppression hearing. The clip shows his vehicle stationary in the turnaround at a time of 17:52:33, prior to the incident at issue. In light of the testimony regarding how the MVR units operate and the "pre-event recording" function, Trooper Stahl was questioned as to why his vehicle was stationary in the entire clip as opposed to showing some movement if, as he testified, he put his *front* lights on as he pulled in.[2] After viewing the clip on the witness stand, he testified "I am pulled over, stopped, turn my lights on. And what you see is what you get." T1–155. After being asked by defense counsel if he turned his lights on *after* he stopped, he responded "I don't know. I told you that. I don't know for sure when I turned them on. I just know I turned them on because I pulled in—I mean, we set that up for a decoy up there." *Id.*

### A. *Observation of Traffic Infraction*

The parties dispute whether Webster signaled before exiting at 322. Webster testified that as he approached Exit 322, his gas gauge was below one-quarter tank and he signaled to enter the exit lane. Trooper Stahl testified that from his vantage point in the turnaround, he observed the Honda Accord fail to signal as it entered the exit lane in violation of Kansas state law requiring motorists to signal within a hundred feet of a lane change or a turn. *See* Kan. Stat. Ann. § 8–1548 (West 2010).

Defendants contend that Trooper Stahl could not have possibly seen Webster fail

to signal based on the following evidence: 1) the distance between the 322 exit lane and the turnaround where he was positioned; 2) the topography of I–70 between the exit lane and the turnaround; and 3) his obstructed view. Defendants argue that he instead saw the vehicle as it was coming down the Exit 322 ramp and pulled the Honda Accord over based solely on his suspicion that they were attempting to avoid the drug checkpoint.

### 1. *Distance*

Trooper Stahl asserted that he logs "hundreds of miles on I–70 every week," is familiar with the terrain around Exit 322, and knows the specific configuration of Exit 322. T1–165. He testified several times that his location in the turnaround was approximately 100 yards to the east of Tallgrass Road. Tallgrass Road is a local country road that runs perpendicular to and crosses under I–70. He explained that Exit 322 is approximately 100 yards to the west of Tallgrass Road. According to him, the total distance between the turnaround and the Honda Accord as it approached the exit lane was 200 yards.

Defense investigator Thomas Kubisch ("Investigator Kubisch") testified that on September 28 and 29, 2010, he traveled to Kansas and took photographs and videos and conducted measurements of the area around Exit 322. He measured the distance between the turnaround to the beginning of the 322 exit lane where the Honda Accord exited I–70. That distance was a little over 1200 yards and is equal to almost three-quarters of a mile or 3,996 feet. The actual distance of 1200 yards is far from Trooper Stahl's estimation of 200 yards.

**2.** Activation of his *front* emergency lights would, according to Mr. Downing and Trooper Stahl, activate the MVR unit and include

approximately 30 seconds of "pre-event recording."

The parties also admitted photographs depicting the layout of the area around Exit 322. Defendants offered photographs to demonstrate that the distance between the turnaround and the exit lane was so far that it would be impossible for the naked eye to observe a signal or failure to signal. The Government offered photographs, principally during Trooper Stahl's rebuttal testimony on the second day of the hearing, to show that vehicles entering the exit lane were visible from the turnaround.

Both sets of photographs are to some degree unreliable. Investigator Kubisch did not take any photographs or video from the actual turnaround where Trooper Stahl was positioned. His photographs were taken from the shoulder on each side of the highway, approximately 25 feet north and south of the turnaround. Investigator Kubisch testified that he did not take any photographs from within the pavement of the turnaround because he was not sure whether it was legal to enter the turnaround and he was also concerned about safety. The Government contends these photographs do not accurately depict the area. Trooper Stahl testified that he would never set up on the north or south side of the turnaround where Investigator Kubisch took the photographs because the road is crowned. He explained that the road is crowned and the shoulder is too low. As a result, "you don't have a vantage point to be able to see on either side. We just always do it right in the center there." T2–94. Defendants' photographs accurately display the distance and view with the naked eye but were not taken from where he was positioned.

On the second day of the suppression hearing, the Government admitted photographs taken by Trooper Stahl himself. While these photographs more accurately display the angle and topography from the turnaround, all but one were taken using a zoom lens. Government's exhibit 24 is the only photograph in that series that he took without a zoom lens. He testified that he was not using binoculars or a zoom lens to view traffic on June 2, 2010. Further, while the location in the Government's photographs is more akin to where he was positioned in the turnaround, Trooper Stahl testified that he took exhibit 24 while standing outside his patrol vehicle, facing west toward Exit 322. This is in contrast to his actual position on June 2, 2010, seated in his patrol vehicle facing east, observing traffic to the west through his rear-view mirror looking through his back window.

While both sets of photographs fail to replicate the conditions on June 2, 2010, defendant Webster's exhibit 6 is helpful to demonstrate the view with the naked eye over 1200 yards away. That photograph was taken by Investigator Kubisch from the north shoulder of I–70 westbound, parallel with the turnaround, and no zoom lens was used. I–70 looking west, as Trooper Stahl was doing through his rear-view mirror on June 2, 2010, is uphill rising to a crest. The crest is where Tallgrass Road cuts under I–70. The eastbound exit lane for 322 is beyond the crest when facing east from the turnaround. Investigator Kubisch testified that a vehicle in that photograph seen cresting the hill at Tallgrass Road, barely visible to the naked eye due to the distance, had already passed the exit lane. T2–66. Based on that photograph demonstrating that a vehicle which had already passed the exit lane was almost impossible to see, a vehicle even further away approaching Exit 322 would surely be even more difficult, if not impossible, to see with the naked eye.

## 2. *Topography*

Trooper Stahl testified that "approximately without going out and measuring it,

from where I sat, there is at least a half mile clear view of I–70 in the eastbound lanes prior to Exit 322. It is a long, flat, straight stretch of road." T1–160. This half mile stretch of I–70 was where Webster was traveling prior to entering the exit lane. He also explained that from his view in the turnaround, he could see the whole front of the Honda Accord including the area where the signal light would be. He testified that I–70 dipped *after* 322, starting at the Tallgrass Road crest, down to where he was located in the turnaround. T1–101.

Photographs admitted by both parties demonstrate that looking west from the turnaround, there was not a clear view of a half mile behind the crest of I–70 over Tallgrass Road. Instead, looking west beyond the crest at Tallgrass Road and in the area of Exit 322, there is a depression in the road. Trooper Stahl testified that the depression is just *prior* to the exit lane and acknowledged that his view of vehicles as they go down into the dip is partially obstructed. T2–95 (depression referred to as a "dip"). He explained that he can see the top half of vehicles in that location, but not the bottom half.

Three of his photographs demonstrate the obstruction of vehicles as they enter, travel in, and reemerge from the depression just prior to the exit lane. Government's exhibits 28, 29, and 30, taken in sequence from the turnaround facing west, show that vehicles disappear from sight as they approach the area where the exit lane is. Vehicles then reappear as they drive out of the depression and approach where I–70 crests over Tallgrass Road, which is past the exit lane.

Government's exhibit 28 shows two vehicles traveling I–70 near Exit 322. There are two vehicles visible in the photograph: vehicle # 1 and vehicle # 2. In the second photograph of the sequence, Government's exhibit 29, the vehicle furthest west, vehicle # 2, begins to drop into the depression as it approaches Exit 322. The closer vehicle, vehicle # 1, is on or near the crest over Tallgrass Road. *See* Ex. G–29. In the third photograph, Government's exhibit 30, vehicle # 1 has completely passed the crest at Tallgrass Road and is coming down the front of the dip described by Trooper Stahl. *See* Ex. G–30. Vehicle # 2 is almost invisible because it is in the depression coinciding with Exit 322. Vehicle # 3, which was not visible in exhibits 28 or 29, is emerging from the depression and approaching the crest at or near Tallgrass Road. The depression near Exit 322 is the same area that Trooper Stahl originally testified was long and flat.

These three photographs demonstrate that the depression essentially swallows up vehicles so that vehicles traveling I–70 east cannot be seen from the turnaround when they are in the depression. Because of the depression, someone positioned in the turnaround could not see "clear" a half mile prior to the exit lane. What can be seen from the turnaround facing east however are vehicles *after* they take the Exit 322 ramp. Trooper Stahl testified that from the turnaround, the top portion of the ramp is blocked and so is the bottom, but "you can see them when they are part way down the ramp." T2–103. Whether he could have seen the Honda Accord as it proceeded down the ramp is irrelevant because the vehicle would have already left I–70 and no signal was necessary at that point.

### 3. *Obstructed View*

Trooper Stahl's actual position in his police vehicle resulted in an even more obstructed view. He was seated in the driver's seat, facing east in the turnaround, and observed in his rear-view mirror traffic to the west through his back window.

He acknowledged a number of other obstructions to his view in the police vehicle including two banks of emergency lights in the back window; wires for defrost in the back window; additional apparatus on top of the bank of emergency lights; a video camera on one side of the back window that faces out of the vehicle; and head rests in the back seat. From that position he claims to have viewed in his rear-view mirror the 2002 Honda Accord, a distance of 1200 yards or three-quarters of a mile to the west with a highway depression in between, fail to signal a right hand turn. Impossible.

#### 4. *Usual Position of KHP Troopers*

Finally, Trooper Stahl's testimony regarding the usual practices of the KHP interdiction team at Exit 322 further supports a finding that he could not and did not observe the traffic infraction from the turnaround. He testified that generally, KHP officers park a police vehicle in the turnaround and leave the emergency lights on so that people approaching Exit 322 can see the emergency lights as they are approaching the drug checkpoint signs. Officers then get in another officer's vehicle and park "underneath" [3] to watch for traffic infractions such as failing to stop at the stop sign or failing to signal at the stop sign. T2–93. He explained that on June 2, 2010, he was by himself. He testified: "My partner hadn't gotten out there yet. So I went and pulled my vehicle up and parked to wait for him." *Id.* He had just moved into the turnaround when he observed the Honda Accord through his rear-view mirror.

What is likely the case is that Trooper Stahl entered the turnaround on June 2, 2010, and parked his vehicle to wait for his partner to pick him up. However, before his partner, KHP Trooper Jarrett Ranieri

("Trooper Ranieri"), arrived and both officers could travel to a different location to watch for traffic infractions, he observed the Honda Accord driving down the Exit 322 ramp after it had already left I–70. He then likely left the turnaround to pursue defendants' vehicle. His assertion that he witnessed Webster fail to signal is discounted. The credibility issue is resolved in Webster's favor in light of the overwhelming physical evidence demonstrating that Trooper Stahl could not have actually observed Webster fail to signal before exiting I–70.

### B. *Traffic Stop of the Honda Accord*

The parties dispute whether defendants were actually stopped alongside I–70. Webster testified that he signaled, entered the exit lane, and proceeded to leave I–70 and drive down the ramp to Tallgrass Road. After coming to a stop at the intersection of the exit ramp and Tallgrass Road, he took a left turn onto Tallgrass Road and traveled on Tallgrass Road through the tunnel under I–70. As he approached the onramp to reenter I–70 in the westbound direction, he observed the KHP police vehicle operated by Trooper Stahl suddenly drive up the 322 westbound exit to the right of his vehicle. Webster testified that he then signaled and made a left turn from Tallgrass Road onto the I–70 west entrance ramp. He testified that upon completing his turn onto the ramp, the *front* grill emergency lights on the KHP police vehicle were activated and he pulled to the right shoulder of the entrance ramp.

Trooper Stahl testified that from his vantage point in the turnaround, he observed the Honda Accord fail to signal as it entered the exit lane for 322. He then left the turnaround and traveled I–70 to-

---

**3.** "Underneath" is presumably Tallgrass Road    where it travels under I–70.

ward the 322 westbound exit. He drove to the end of the 322 westbound exit ramp, where he observed Webster's vehicle to his left as the Honda Accord was proceeding on Tallgrass Road. Webster turned left from Tallgrass Road onto the 322 westbound entrance ramp and Trooper Stahl attempted to get close enough to read the license plate so that he could call dispatch with the information. He maintains that he activated only his *rear* emergency lights to alert traffic behind him that he would be conducting a traffic stop. He testified that Webster then pulled over on the entrance ramp's right shoulder and that he did not activate his *front* grill or *top* emergency lights.

He also testified that when conducting a traffic stop, it is his usual routine to first call dispatch with the vehicle's license plate and location before conducting the actual stop. He generally waits for information to learn if the vehicle has been reported stolen, has an expired registration, or any other information that would be helpful before approaching the vehicle. At some point during or after this contact with dispatch, he turns on his *rear* emergency lights to warn traffic coming up behind him that he is about to conduct a traffic stop. The *rear* lights are not visible to those in front of the police vehicle. After dispatch responds, he activates his *front* grill and/or *top* emergency lights to pull the vehicle over.

Trooper Stahl testified that after the Honda Accord pulled to the side of the ramp, he parked his police vehicle behind the Honda Accord and immediately exited his vehicle for officer safety reasons without first activating his front grill or top emergency lights or camera. He approached the passenger side window and

identified the occupants as Webster and Murphy and asked if they were okay because they had suddenly stopped on the side of the road. He informed them he was going to stop the vehicle anyway because Webster failed to signal when he exited at 322. He obtained Webster's driver's license, insurance, and registration and spoke with defendants for approximately five minutes. The registration showed that the Honda Accord was purchased 15 days prior.

During this initial encounter he made several observations which he contends made him suspicious. First, he observed there was nothing in the vehicle and no visible luggage. Except for a couple of shirts laying on the back seat floor, the vehicle's interior was empty. He stated that the occupants were nervous and that Murphy "did all the talking" and that "Webster was very rigid and tense in the driver's seat and didn't speak much" and that "[h]e sat very stiff. He kept looking forward. His hands were shaking. He looked very tense and nervous." T1–25. He testified there was a very strong odor of fresh paint emanating from the vehicle. In his experience, the smell of fresh paint in a vehicle indicates that "it has either been recently wrecked and repaired or it is a very good indicator, very strong indicator of a possible concealment method in the vehicle, a compartment." T1–26.

He asked defendants why they exited and reentered I–70 to which Murphy responded they were looking for a gas station and saw one at a rest stop they passed a few miles back. He found this suspicious because there was a rest stop approximately 12 miles back but it did not have a gas station and the vehicle had one-half tank of gas.[4] Webster testified that

---

**4.** Notably, Trooper Stahl later testified on the second day of the suppression hearing that

"[y]ou could tell it was above a quarter. And since I was at quite an angle, I just assume,

he had below one-quarter tank of gas when he decided to exit I–70. Trooper Stahl testified that while Webster was getting his driver's license out, he asked where they were going and Murphy responded they were heading back to Quebec. When asked where they were coming from, Murphy "initially said Los Angeles." T1–26. Trooper Stahl said this made him suspicious because Murphy later changed his story and said they went to Las Vegas.

Trooper Stahl returned to his patrol vehicle with Webster's driver's license and made an oral account of the stop using his tape recorder.[5] His oral account noted that defendants exited I–70 after seeing the drug ruse signs and that Murphy said they were turning around for gas. The oral record did not mention anything about the nervousness of the defendants, the smell of fresh paint, seeing a half tank of gas, or conflicting stories about where they were coming from. The approximately five minute long initial encounter and the communications with Murphy and Webster which raised his suspicions were neither captured on video nor audio.

With respect to the conflicting testimony about the gas gauge, none of the photographs taken by Task Force Officer David Grittman ("TFO Grittman") at the scene on June 2, 2010, or taken by Trooper Stahl since that day show the gas gauge. Trooper Stahl testified that he was not sure whether he informed TFO Grittman about his suspicions regarding the half tank of gas. He knew TFO Grittman had a camera and was taking photographs but never advised him to photograph the gas gauge. Trooper Ranieri explained that his partner told him about his observations including the half tank of gas but never

personally looked at the gas gauge. TFO Grittman testified that Trooper Stahl informed him about the half tank of gas, but he did not photograph the gas gauge either. TFO Grittman also prepared a detailed ten page report on June 11, 2010, regarding the June 2, 2010, incident and the report likewise states that Trooper Stahl informed him there was a half tank of gas. *See* Ex. D–8.

Following the search of the vehicle and defendants' arrest on June 2, 2010, the Honda Accord was driven approximately 36 miles from the scene alongside I–70 to the KHP impound lot where it remained from June 2, 2010, until the suppression hearing. Investigator Kubisch inspected and photographed the vehicle at the KHP impound lot on September 28, 2010, during his trip to Kansas. He took photographs of the instrument panel both with the vehicle off and with the vehicle on. Defendant Webster's exhibit 2 shows the view standing outside the vehicle with the driver's side door open, with the vehicle turned off. It is clear that the instrument panel has three gauges, and that the gas gauge is to the far right. In exhibit 2, the needle on the gas gauge is below "E." Defendant Webster's exhibit 3 shows the view from inside the vehicle, sitting in the driver's seat, with the vehicle turned on. Exhibit 3, taken approximately 15 seconds after turning the vehicle on, shows the needle on the gas gauge barely above "E."

Investigator Kubisch took defendant Webster's exhibit 4 while standing outside the passenger's side of the vehicle with the door open. He was positioned "about equal to the back part of the seat" and standing where an individual may be

---

you know, when you are looking at an angle like that, if you can see the quarter on the gauge, then you know it has got to be up further to get it on there." T2–104.

5. He testified that if anything looks "fishy" when he conducts a traffic stop, he tries to narrate the details using his tape recorder. T1–127.

standing outside the passenger's side window. T2–50. He testified that his purpose was to get an accurate description of the vehicle, and he was not attempting to determine what in the dashboard he could see from the passenger window. When asked how many of the instrument gauges in the dashboard he could see from that vantage point, he responded two; he could not see the gas gauge. He further stated that on September 28, 2010, while inspecting and photographing the vehicle there was no point where, standing on the passenger's side of the vehicle, he could see any of part of the gas gauge.

He also testified that according to the manufacturer specifications, the Honda Accord has a 17.1 gallon gas tank, and achieves mileage of 20 miles per gallon in the city and 28 miles per gallon on the highway. The vehicle was driven approximately 36 miles from Exit 322 to the KHP impound lot at Exit 358. Assuming the Honda Accord achieved at a minimum 20 miles per gallon on the 36 mile drive to the KHP impound lot, even though it was almost all highway, it likely consumed less than two gallons or approximately one-eighth tank of gas. The gas gauge viewed by Investigator Kubisch on September 28, 2010, is consistent with Webster's statement that he had below one-quarter tank and consistent with Murphy's comment that he looked and saw a quarter tank and suggested they look for gas. If the vehicle had below one-quarter tank on June 2, 2010, and was then driven 36 miles using approximately one-eighth tank of gas, it makes sense that following that trip, the gas tank was somewhere between empty and one-quarter tank. As Investigator Kubisch testified, the needle on the gas gauge on September 28, 2010, was barely above "E."

Taken together, the photographs of the gas gauge and the distance the vehicle was driven make it near impossible for the Honda Accord to have had one-half tank of gas on June 2, 2010, as Trooper Stahl claims. According to Webster, "[f]or that observation to be true, the vehicle would have to have expended roughly 8 gallons of gas over the 36 miles to the impound lots, at 4.5 miles per gallon." Def.'s Findings of Fact & Conclusions of Law, Dkt. No. 39, 13. Further, Trooper Stahl's testimony that he saw the gas gauge while on the passenger's side is doubtful in light of Investigator Kubisch's testimony and photograph taken outside the passenger's side door. Finally, his oral account using the tape recorder following the initial encounter mentioned nothing about seeing the gas gauge at one-half tank although his later reports and testimony cite the gas gauge as a factor raising his suspicion.

Trooper Stahl's claim that the Honda Accord had a half tank of gas on June 2, 2010, is discounted based on the physical evidence demonstrating that he could not have seen the gas gauge from where he was standing and the needle on the gas gauge having registered at barely above "E" on September 28, 2010, after having only been driven approximately 36 miles.

Trooper Stahl contends he returned to his patrol vehicle after the initial encounter, turned on the MVR unit using his belt microphone, and contacted dispatch with information pertaining to Webster and the Honda Accord. Video footage of the incident from the MVR unit was admitted at the suppression hearing. See Ex. G–4. A transcript of the audio heard in the video was also admitted. See Ex. G–20. Consistent with his testimony that he did not activate the camera until he returned to his police vehicle following the initial encounter, the video footage begins with his vehicle already parked behind the stationary Honda Accord on the I–70 westbound entrance ramp. There is no audio for

approximately the first 20 seconds of the video. The first audio heard on the video is Trooper Stahl creating the oral record of what just occurred using his tape recorder. At approximately the two and a half minute mark in the video, dispatch responds with information on Webster's probationary driver's license. There is no audio on the video of him calling dispatch with the vehicle's license plate or location.

A separate audio recording was also admitted at the suppression hearing. *See* Ex. G–22. The audio recording includes all dispatch communications between KHP dispatch and officers in the vicinity of the incident on June 2, 2010. The recording however is not a real-time recording. It includes transmissions spanning nearly two hours, from 17:24 to 19:21, or 5:24 p.m. to 7:21 p.m., which are compressed into a 39 minute and 36 second recording. In the absence of a verbal announcement from a dispatcher of the time of a particular transmission, the recording does not establish the time of each transmission. At a time code of 13:10, Trooper Stahl called dispatch to report the traffic stop, a "10–44," with his location and the license plate. An undetermined amount of time later, he requested the "10–27" to have Webster's driver's license checked. All of these transmissions occurred on the audio recording before the first dispatch communication that is audible on the video. The first dispatch transmission that is heard both on the audio recording and the video footage is the dispatcher's return of Webster's driver's license status as probationary, in response to the "10–27" request. On the audio of the dispatch transmissions, the "10–27" license check occurred after the "10–44" call notifying dispatch of the stop.

A Computer Assisted Dispatch ("CAD") report was also admitted. *See* Ex. G–21. Trooper Stahl explained that the CAD re-

port is generated by the dispatcher and details contact between the dispatcher and an officer on a particular stop. The report reflects the first time dispatch is notified of an incident. The CAD report for this stop shows an incident date and time of June 2, 2010, at 17:52:00, or 5:52 p.m. The first remark entered by the dispatcher on the CAD report was at 17:57:04, or, 5:57 p.m.

Trooper Stahl testified that he communicated the location of the stop *and* the license plate to dispatch upon returning to his vehicle *after* the initial five minute long unrecorded encounter. However, the audio recording of the dispatch communications, viewed in conjunction with the CAD report and video footage of the stop, suggest that he notified dispatch of the traffic stop, or "10–44," *earlier* than upon his return to his patrol vehicle after the initial encounter as he contends. The CAD report reflects that dispatch was notified of the incident at 17:52:00, or 5:52 p.m., while the "10–27" did not occur until 17:57:14, or 5:57 p.m. This approximately five minute long gap suggests that he called dispatch with the "10–44" at 5:52 p.m. as the CAD report states upon observing the Honda Accord, conducted the traffic stop, engaged in the approximately five minute long unrecorded initial encounter, and *then* returned to his vehicle and called in the "10–27" around 5:57 p.m.

The video footage of the stop is also inconsistent with Mr. Downing's testimony regarding how the MVR units work. The Honda Accord is stationary on the right shoulder of the road from the moment the video begins. Trooper Stahl acknowledged twice during the suppression hearing that his *front* flashing emergency lights are clearly activated at the very first moment of the video recording. T1–119, 180. The reflection of those lights are seen in the rear bumper of the Honda

250

Accord. *See* Ex. G–4. According to Mr. Downing's testimony, an MVR unit could not create a video with emergency lights activated from the very first moment of the footage. If the MVR unit was activated by Trooper Stahl at some point, whether by emergency lights or wireless microphone, any video footage produced would "depict whatever was in view of the camera starting from the point approximately 30 seconds before the emergency lights were activated, recording continuously through the point when the emergency lights were activated." Ex. DW–9. If he did as he contends and activated the MVR system with his wireless microphone, referred to as his "belt mike," when he returned to his vehicle, the footage would not depict the emergency lights from the first moment of the video. Instead, it would depict footage for approximately 30 seconds with no emergency lights visible.

Defendants also submitted video footage of other traffic stops he conducted between May 31, 2010, and June 3, 2010. *See* Ex. DW–6, clips 2, 3, 6, 7, 8.[6] The clips of those traffic stops are consistent with Mr. Downing's explanation of how the MVR units work. In clips 2, 3, 6, 7, and 8, the footage depicts a vehicle observed and then pursued by Trooper Stahl. For the first approximately 20 seconds of each of those clips, there is no audio and no visible emergency lights. This is the "pre-event recording" described by Mr. Downing. Clips 2, 3 and 8, which are nighttime stops, and clip 7 which is near dusk, clearly show the activation of the emergency lights ap-

proximately 20 seconds after the clip begins. In each of these clips, audio can be heard at almost the exact same time the emergency lights become visible.

Finally, all three forms of documentation prepared by Trooper Stahl in connection with the June 2, 2010, incident suggest that he actually conducted a traffic stop. After returning to his police vehicle, he began his oral account of the stop by stating "[s]topped this vehicle exited I–70." Ex. G–20. Later that same day, he prepared an Incident Narrative Report. *See* Ex. D–3. That report begins with "[o]n 6/02/2010 at approximately 1752 hours, I conducted a traffic stop on a Gray 2002 Honda ... for a traffic infraction." *Id.* It later provides "I conducted a traffic stop on the Honda on the westbound onramp at Exit 322." *Id.* Finally, he prepared a probable cause affidavit which was generated for probable cause to hold defendants at the jail while they worked with the Drug Enforcement Agency. *See* Ex. D–4.[7] That document states in part "[t]he Honda turned back westbound and I conducted a traffic stop on the Honda on the westbound onramp at Exit 322." *Id.* Nowhere in any of his reports did he detail or even suggest that the Honda Accord abruptly pulled over on its own.

Trooper Stahl's testimony that he did not activate his front or top emergency lights and pull defendants' vehicle over is not credible in light of the video footage, audio recording, and Mr. Downing's testimony. The evidence establishes that he

<hr>

**6.** The Government objected to defendant Webster's exhibit 6 on relevance grounds and it was received for the court's use only. The exhibit contains 12 individual clips. Clip 1 shows Trooper Stahl's vehicle stationary with no traffic stop conducted; clips 2 and 3 contain traffic stops; clips 4 and 5 show the vehicle in motion but contain no traffic stops; clips 6, 7, and 8 contain traffic stops; clips 9 and 10 show the vehicle in motion but con-

tain no traffic stops; clip 11 shows the vehicle stationary with no traffic stop conducted; and clip 12 is the same as Government's exhibit 4, the video footage of the incident at issue.

**7.** Mr. Luibrand cross-examined Trooper Stahl about defendant's exhibit 4 but never moved for the exhibit to be admitted and as such, it was not admitted.

necessarily activated the MVR unit at some point before he claims to have activated it. This supports Webster's testimony that he pulled over on the right shoulder of the I–70 westbound entrance ramp in response to the front grill and/or top emergency lights. Accordingly, defendants have demonstrated that there was a traffic stop.

Finally, with respect to Murphy's claimed inconsistencies in travel plans, the initial encounter during which Murphy first told Trooper Stahl they were coming from Los Angeles is not captured on video or audio. Trooper Stahl's initial oral account using his tape recorder does not mention that the defendants provided conflicting stories. As seen on the video footage, he reapproached the passenger's side window with Webster's driver's license and asked for Murphy's driver's license and asked if they were on vacation. Murphy responded "[y]up." *See* Ex. G–4. The Government's transcript of the video footage provides the following response from Murphy: "Yup. We went to LA, we went to the, Las Vegas, went to Hard Rock Café (inaudible)." Ex. G–20. However repeated playback of the video footage and careful listening raises serious doubts about whether Murphy said "LA." It appears he said: "Yup. We went *at* (inaudible), we went to the, Las Vegas, went to Hard Rock Café Casino." Later during the traffic stop, after the officers discovered the hidden compartment, Trooper Stahl again inquired with defendants as to their travel plans. Murphy informed him again that "we drove down, we went to Vegas, went to the Hard Rock Café, well Hard Rock Casino, and stayed there for three days, and that's about it." Ex. G–20. His Incident Narrative Report describes the initial five minute long unrecorded encounter and states that Murphy said they were coming from *Los Angeles.* His probable cause affidavit states that Murphy said they

were coming from *Las Vegas.* Because the initial encounter during which Murphy stated Los Angeles was unrecorded, and because a portion of the audio is inaudible, it cannot be determined whether Murphy ever stated that they were coming from Los Angeles. Murphy never testified to dispute this contention. Webster testified at the suppression hearing that they went to Las Vegas and never went to California. He also acknowledged that during the stop Murphy talked about being in Los Angeles.

The resolution of this factual dispute is not essential but Trooper Stahl's testimony and reports, viewed in conjunction with the partially inaudible recording, Webster's acknowledgment that Murphy said Los Angeles, and Murphy's failure to dispute this by way of testimony or other physical evidence, is sufficient to establish that Murphy gave conflicting, or minimally, confusing stories.

### C. *Search of the Vehicle*

After contacting dispatch, Trooper Stahl learned that Webster had a probationary driver's license but had a clean record otherwise. He reapproached the passenger's side and asked Murphy if he had a driver's license since Webster's was probationary. Murphy provided his license and he returned to the vehicle to run Murphy's information. He then telephoned his partner to inform him of the situation. Dispatch advised there was a possible hit on Murphy but needed a middle name to confirm. He then muted his microphone and returned to the passenger's side window for a brief moment and then returned to his police vehicle again. There is no audio for approximately four minutes while Trooper Stahl is in his vehicle.

He then returned to the passenger's side of the vehicle and informed defen-

dants he was issuing a warning for Webster's failure to signal and advised them to be sure to signal in the future. Webster is then heard on the video making a comment related to gas, but it is partially inaudible. Trooper Stahl inquired as to where they were headed and Murphy responded they were going home but he looked and saw they had one-quarter tank of gas, and decided to turn around. He stated he had not seen a gas station for at least 50–60 miles to which Trooper Stahl advised there was a gas station 13 miles away and instructed them how to get there. Both defendants said "thanks" in response. Ex. G–20.

Trooper Stahl stepped away from the vehicle, for at most a few seconds, and then asked defendants if he could ask a few questions, to which one agreed.[8] He informed them that he encounters a lot of drug trafficking in the area and asked if they had any contraband in the vehicle to which they replied no. He then stated: "Would you care if we just took a quick look, just to make sure? We don't know you guys, I'm not accusing you or anything. Just, just checking. Is that okay? Okay with you guys?" Ex. G–4. Webster responded "okay." *Id.* He asked defendants to exit the vehicle and said "[w]e won't mess nothing up." *Id.*

At this time, he was joined by Trooper Ranieri and the two officers conducted a search of the vehicle. Very shortly after they started searching, and after removing several items from the trunk, Trooper Ranieri observed what he believed to be signs that the vehicle contained a hidden compartment. After approximately 30 seconds of searching in the trunk, he notified Trooper Stahl that he located a false compartment and they placed both of the de-

fendants under arrest in handcuffs but did not question them at that time. Trooper Stahl testified that the reason they discovered the false compartment so quickly was because generally when you look in the trunk of passenger vehicles, you see the back of the seats and they angle in toward the cab of the vehicle. In the Honda Accord, "directly below the back where the windshield would come down or the back window, there was a wall that was just straight up and down in there." T1–41. He explained that the wall protruded into the trunk and he noticed the metal bars running along the top of the wall which immediately caused him to conclude that there would be levers. He also observed carpet in the rear of the trunk which was a thin, light carpet, while the carpet on the floor and sides of the trunk was a heavy, molded carpet. The rear carpet was a different color and texture than the rest of the carpet, and there were noticeable glue marks from where the rear carpet was glued down. He testified that nothing is glued in a factory vehicle; in other words, the carpet did not come that way. Additionally, before manipulating or removing any of the carpet, the officers could see exposed metal rods near the top of the rear wall; welding marks, which he said were sloppy and likely done by an amateur as opposed to the factory; and an electrical switch box.

After handcuffing the defendants, the video shows the officers continuing to try to access the concealed compartment. After pulling the rear carpet back, the officers observed a metal wall in the rear of the trunk and exposed metal welded to the rear of the trunk. They continued to detect a heavy smell of paint or Bondo, a putty used mainly for automobile body re-

---

8. The transcript of the video recording indicates that it is unclear which defendant agreed to answer questions.

pair. Trooper Stahl is shown in the video coughing which he testified was due to the strong odor of fresh paint. The officers continued to search for wires or switches to access the compartment. Trooper Ranieri eventually pulled back the rear seats to expose the interior of the compartment. He observed several bundles and was able to reach inside the compartment to remove one of the bundles. The bundle contained a white powdery substance which they suspected was cocaine and they contacted TFO Grittman to assist.

They then bent the top of the driver's side rear seat to access the rest of the compartment. Trooper Stahl testified that rear seats normally come forward, but they did not in the Honda Accord because there was a rod welded from the compartment itself to the back of the seats, as well as some kind of a trunk or hood latch welded to the seats so that the seats did not move. They engaged in various methods to try and access the compartment, including using crowbars. They also latched one of their police vehicles to the inside of the seats and tried to use the vehicle's power to break open the back seats by reversing the vehicle and then driving it forward.

### D. Statements Made by Defendants

Approximately forty minutes after the search began and while defendants were handcuffed, Trooper Stahl directed what he characterized as *Miranda* warnings to Murphy and Webster alongside the I–70 ramp. He provided the following information:

> You have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney, one will be presented for you by the courts. You can decide at anytime to give up these rights and not talk to us okay?

Ex. G–20. The transcript of the video footage reflects that Webster did not respond at all to the warnings. Trooper Stahl conceded that he did not know whether Webster heard or acknowledged the rights. T1–185–87. Clearly Webster did not waive his rights. Murphy on the other hand stated "I understand" in response and proceeded to answer questions. The defendants then spoke with Trooper Stahl while handcuffed. Following the search of the vehicle, TFO Grittman transported them six miles to the Alma, Kansas Department of Transportation police facility ("Alma station"). He then questioned each defendant in separate rooms.

During the suppression hearing TFO Grittman first testified as to his interview with Murphy. He testified that he asked him if he had previously been advised of his rights and Murphy advised he had. He explained that he then used a printed card which he carries in his pocket and specifically read each *Miranda* right to Murphy and asked if he understood each right to which he answered affirmatively. He testified this is his approach for every interview he conducts and that he reads from a card so he does not forget anything. He also stated that he advised Murphy he could "decide at any time to exercise these rights and not answer any questions or makes [sic] any statements." T1–217. He asked if he understood those rights and Murphy advised he did. Murphy then provided TFO Grittman with information regarding the transportation of the cocaine. Murphy did not testify at the suppression hearing.

TFO Grittman next testified regarding his interview with Webster. He stated that he went through the exact same process with Webster, asking him if he had been advised of his rights to which he said

yes. He explained that he read each line of his *Miranda* card, asking Webster if he understood, to which he said he did and was willing to talk. Webster then provided TFO Grittman information about the drugs and the trip. Shortly thereafter he said he was done talking. TFO Grittman responded that it was fine and he did not have to talk. Webster testified at the suppression hearing that TFO Grittman never advised him of his *Miranda* rights at the Alma station.

TFO Grittman also testified about the detailed ten page report he prepared on June 11, 2010, regarding the June 2, 2010, incident. The report details his interviews with defendants at the Alma station and his subsequent interview with Murphy at the Wabaunsee County Jail. The portions of the report dealing with the Alma station interviews provide that he asked each defendant if they had been read their *Miranda* rights and if they understood them. According to the report, both Murphy and Webster advised they had previously been advised of their rights and understood them. The report then states that he asked each defendant whether bearing those rights in mind, they would answer a few questions. The report follows with the information he learned from the interviews. Nowhere in the ten page report does it state that he administered *Miranda* warnings himself to the defendants.

Following their interviews at the Alma station, defendants were transported to the Wabaunsee County Jail on narcotics charges, pending further investigation. TFO Grittman interviewed Murphy again on June 3, 2010, at the Wabaunsee County Jail. During this interview, he attempted to arrange for a controlled delivery of the cocaine. He testified at the suppression hearing that before he began the interview, he reread each *Miranda* right, like he did the day before at the Alma station,

and asked Murphy whether bearing those rights in mind he would answer questions. Murphy responded that he had no problems after being read each right and agreed to talk. The section of the June 11, 2010, report detailing the interview at the Wabaunsee County Jail does not say anything about TFO Grittman reading Murphy his *Miranda* rights. In fact, the summary of that interview is completely devoid of any mention of *Miranda*.

On cross-examination, TFO Grittman explained that he had "gotten away from" using advice of rights forms and *Miranda* waiver forms when interviewing suspects. T1–225–26. He also testified that the June 11, 2010, report he prepared was true and accurate and detailed all of the important information in the case. He acknowledged that the report said nothing about his personal administration of *Miranda* warnings and made no mention of the pocket card he testified he read from. He also stated that there were no witnesses to his administration of *Miranda* warnings at either the Alma station or the Wabaunsee County Jail.

His testimony regarding administering each *Miranda* warning to defendants at the Alma station on June 2, 2010, asking separately if they understood each right, and asking separately if they would give up those rights and agree to answer questions, is incredible in light of the omission of those events in his detailed June 11, 2010, report and Webster's testimony to the contrary. Likewise, his testimony that he reread Murphy his *Miranda* rights at the Wabaunsee County Jail on June 3, 2010, is not credited based on the absence of *any* mention of *Miranda* in his interview summary. His testimony at the suppression hearing appears to be designed to overcome the deficient *Miranda* warnings provided by Trooper Stahl alongside I–70.

## IV. CONCLUSIONS OF LAW

### A. Seizure of Honda Accord

■ Defendants have satisfied their burden of production by establishing that the Honda Accord was seized when Trooper Stahl activated his *front* and/or *top* emergency lights and Webster pulled over in response to those lights. A traffic stop is a seizure subject to the parameters of the Fourth Amendment. *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994). The burden now shifts to the Government to articulate a valid basis to justify the seizure under the Fourth Amendment.

### B. Basis for Traffic Stop

■ The Government contends that even if Webster had not voluntarily pulled his vehicle over, Trooper Stahl would have conducted a traffic stop based on his observation of a traffic infraction. A traffic stop is justified if a police officer has probable cause or reasonable suspicion to believe that an individual violated the traffic laws. *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979). The probable cause or reasonable suspicion must be based on objective facts. *Id.* at 654, 99 S.Ct. at 1396. "Probable cause arises when the police reasonably believe that 'an offense has been or is being committed.'" *Scopo,* 19 F.3d at 781 (quoting *United States v. Cruz,* 834 F.2d 47, 50 (2d Cir.1987)). Observation of a traffic violation by a police officer is sufficient to establish probable cause to justify a traffic stop. *Id.* at 782. Without probable cause or reasonable suspicion based on objective facts, a traffic stop violates the Fourth Amendment. *Id.* at 781 (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Evidence seized from a traffic stop conducted in violation of the Fourth Amendment may be suppressed under the fruit of the poisonous tree doctrine. *Id.* (citing *Wong Sun v.*

*United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)).

■ Based on the findings of fact above, Trooper Stahl's testimony that he observed Webster commit a traffic violation is not credited and the Government has offered no other objectively reasonable basis to justify the stop. As a result, the stop is unconstitutional. *See Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401.

### C. Consent to Search

Having concluded that Trooper Stahl's seizure of the Honda Accord violated defendants' Fourth Amendment rights because the stop was not supported by reasonable suspicion or probable cause, it must be determined whether subsequent events were sufficiently attenuated as to dissipate the taint of the initial unlawful stop. *See, e.g., Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988). The Government contends that defendants gave voluntary consent for the KHP officers to search the vehicle. Defendants argue their consent was not voluntary because it was tainted by the prior illegality.

■ The Government bears the burden of proving a break in the causal chain. *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). When consent follows an illegal search or seizure, the Government must also prove that the consent was "sufficiently an act of free will to purge the primary taint of the unlawful" act. *United States v. Vasquez,* 638 F.2d 507, 527–28 (2d Cir. 1980) (quoting *Brown,* 422 U.S. at 599, 95 S.Ct. at 2259). An illegal stop invalidates a defendant's consent to search unless the Government can demonstrate that the taint of the unlawful stop "had been dissipated before the consent was given."

*United States v. Montilla,* 928 F.2d 583, 590 n. 3 (2d Cir.1991). Four factors to be considered in determining whether the effect of a tainted stop has sufficiently dissipated are: 1) whether a *Miranda* warning was given; 2) the temporal proximity between the detention and the consent; 3) the presence of intervening circumstances; and 4) the purpose and flagrancy of the illegal stop. *Kaupp v. Texas,* 538 U.S. 626, 633, 123 S.Ct. 1843, 1847, 155 L.Ed.2d 814 (2003); *see also United States v. Restrepo,* 890 F.Supp. 180, 196 (E.D.N.Y.1995)

▉▉▉▉ First, defendants were not provided *Miranda* warnings prior to giving consent, which weighs against dissipation. Second, the temporal proximity between the illegal seizure of the vehicle and the consent was almost nonexistent; the video demonstrates that Trooper Stahl concluded the traffic stop by giving Webster a warning for failure to signal, removed his hands from the window of the vehicle, took a step away from the window and then proceeded to ask defendants if they minded if he asked a few more questions. He then almost immediately obtained consent to search the vehicle. He testified that he was trained to conduct drug interdictions using a method called the "Kansas Two Step." In the Kansas Two Step, "[y]ou break contact, give them their information back, tell them they are free to leave ... [b]ecause by law they have to feel free to leave to give consent to search." T1–137–38. The lack of temporal proximity here, and the fact that the traffic stop was barely concluded when he almost immediately obtained consent, supports a finding that the consent was tainted by the illegal traffic stop.

The bulk of the Government's argument for dissipation rests on the third factor, intervening circumstances. Trooper Stahl contends that he developed circumstances establishing probable cause, or alternative-ly that intervening circumstances occurred, between when he seized the vehicle and when he obtained consent such that the consent was not tainted by the illegal seizure. The intervening factors include these observations: 1) the nervousness of the defendants; 2) the vehicle's half tank of gas; 3) inconsistencies in the origin of defendants' trip; 4) the smell of fresh paint; and 5) Canadian license plates. The inquiry focuses on whether the evidence was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *See Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417.

Most if not all of these observations were not recorded by video or audio because they occurred during the initial five minute long encounter before Trooper Stahl activated his MVR unit. The oral record he made immediately upon returning to his vehicle did not mention the nervousness of the defendants, seeing the gas gauge at one-half tank, or conflicting stories about where they were coming from. For the reasons discussed above, the observation of a half tank of gas is not credited and cannot constitute an intervening factor here to dissipate the taint of the illegal stop. The Government's contention that the Canadian license plate triggered his suspicion is also without merit. Trooper Stahl first explained that he does not see a lot of Quebec plated vehicles in that part of Kansas. T1–27. I–70 runs from California to the east coast and at Kansas City, east of Exit 322, there are highways traveling north to Canada. On cross-examination he acknowledged that it does not necessarily raise his suspicion to see a vehicle from Canada driving across the State of Kansas and that they "see all kinds coming through there." T1–96.

With respect to the other observations, the defendants were undoubtedly ner-

vous—they were traveling in a foreign country and transporting 21 kilograms of cocaine when stopped by a police officer. Murphy's inconsistent information regarding where they were traveling from may have arose Trooper Stahl's suspicions and constitutes an intervening factor in this analysis. Likewise, while not mentioned in his initial oral record, the smell of fresh paint is corroborated by the video footage showing him coughing because the fresh paint odor was so strong as he worked to remove items from the trunk. He also explained that in his experience, the smell of fresh paint in a vehicle indicates that "it has either been recently wrecked and repaired or it is a very good indicator, very strong indicator of a possible concealment method in the vehicle, a compartment." T1–26. While credited, these intervening circumstances are insufficient to overcome the extremely strong temporal proximity between the illegal traffic stop and the consent.

Finally, defendants assert that Trooper Stahl's conduct in initiating the stop in the absence of a traffic violation was flagrant and weighs against attenuation. They suggest that the video footage was manipulated and that he intentionally omitted facts from his reports which seriously affect his credibility. While there is certainly evidence that his motivation for pulling the Honda Accord over was merely its exit from I–70 in the presence of drug checkpoint signs, on this record there is no need to rule that he intentionally committed any misconduct. At worst, he appears to have tailored his testimony in an attempt to justify the stop and search. Because of the actual highway topography and the contemporaneous video and audio recordings, his attempt failed.

Only one of the considerations, intervening circumstances, even partially supports the Government's position that the consent

was purged of the illegality of the traffic stop. The remainder of the factors—particularly the lack of *Miranda* warnings and the temporal proximity between the unjustified stop and the consent—weigh against dissipation. Accordingly, the Government has failed to satisfy its burden that the consent was sufficiently attenuated from the initial unlawful seizure, and the cocaine and other items including the navigation device and cellular phone found in the Honda Accord must be suppressed.

### D. *Statements Made by Defendants*

Defendants move to suppress statements obtained in violation of *Miranda*, both at the scene of their arrest on I–70 and later at the Alma station. Under the Fifth Amendment, no "person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Once a suspect is taken in custody, law enforcement officials must issue *Miranda* warnings explaining the right against self-incrimination and the right to consult with an attorney prior to being interrogated. *Georgison v. Donelli,* 588 F.3d 145, 154 (2d Cir.2009) (citing *Colorado v. Spring,* 479 U.S. 564, 572, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987)). If no *Miranda* warnings are issued, statements obtained during the interrogation are typically inadmissible at trial. *Id.* at 155 (citations omitted).

Defendants have satisfied their burden of production by alleging custodial interrogation in the absence of proper *Miranda* warnings. Based on Webster and Murphy's allegations, the burden shifts to the Government to prove *Miranda* voluntariness by a preponderance of the evidence, "either because there was no custodial interrogation implicating *Miranda,* there was some exception to the *Miranda* rule, or because [defendants] [were] properly Mirandized and waived [their] rights."

*United States v. Miller,* 382 F.Supp.2d 350, 362 (N.D.N.Y.2005) (Sharpe, J.) (quoting *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618 (1972); *United States v. Anderson,* 929 F.2d 96, 98 (2d Cir.1991)). At issue here is whether defendants were properly Mirandized and subsequently waived their rights.

### a. Custodial Interrogation of Murphy and Webster by Trooper Stahl Alongside I–70

■ Defendants take issue with the portion of *Miranda* warnings relating to the right to counsel and contend that the advisement was insufficient because it informed them they only had a right to counsel at court. They also argue that Trooper Stahl's instruction on waiver was insufficient to produce voluntary and knowing waivers. As previously noted, after the defendants were handcuffed alongside I–70, Trooper Stahl directed what he characterized as *Miranda* warnings to defendants. *Miranda* requires that law enforcement officers provide the "following four now-familiar warnings: A suspect must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Florida v. Powell,* —— U.S. ——, 130 S.Ct. 1195, 1203, 175 L.Ed.2d 1009 (2010) (internal quotations and citation omitted). The four warnings are invariable but the manner in which they are spoken is not. *Id.* at 1204. "In determining whether police officers adequately conveyed the four warnings . . . courts are not required to examine the words employed as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably convey to a suspect his

rights as required by *Miranda.*" *Id.* (internal quotations and citation omitted). To prove a valid waiver, the Government must show: "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir.1995).

Trooper Stahl communicated the following statement to defendants:

> You have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney, *one will be presented for you by the courts.* You can decide at anytime to *give up these rights and not talk to us* okay?

Ex. G–20 (emphasis added). Webster never responded to these warnings and Trooper Stahl acknowledged at the suppression hearing that he did not know whether Webster heard or acknowledged these rights. T1–185–87. Accordingly, Webster never waived his rights. Murphy stated "I understand" in response and proceeded to answer questions.

Trooper Stahl's statement that "[i]f you cannot afford an attorney, one will be presented for you by the courts" was certainly not the clearest possible formulation of *Miranda*'s right to counsel advisement. However it need not be decided whether it was sufficient to convey the right to counsel because the Government cannot demonstrate that the defendants waived their rights.

■ It is undisputed that Webster never responded to the warnings. There is absolutely no evidence that he ever waived his rights. Accordingly, Webster never relinquished his rights and the first prong of the *Jaswal* test cannot be met. 47 F.3d

at 542. All statements made by Webster alongside I–70 while in custody will be suppressed.

■ Although Murphy acknowledged the warnings and stated "I understand" in response, Trooper Stahl did not correctly inform Murphy how to waive his rights. His incomprehensible instruction on waiver was insufficient to effect a voluntary and willing waiver from Murphy.[9] The Government has not demonstrated that Murphy "had a full awareness of the right being waived and of the consequences of waiving that right" as required by *Jaswal* to prove a valid waiver. 47 F.3d at 542. Presumably Trooper Stahl meant to say that defendants could either: 1) give up their rights and talk to the officers; or 2) invoke their rights and not talk to the officers. Instead he communicated a combination of these two possibilities. The way the instruction was posed made the consequences of waiver confusing and at best, unclear. As a result, Murphy's acknowledgment and waiver were invalid and all statements made by him alongside I–70 while in custody will be suppressed.

Because the Government cannot establish that either defendant voluntarily relinquished his *Miranda* rights and fully understood the effect of giving up those rights, all statements made at the scene of the incident on June 2, 2010, will be suppressed.

b.  **Custodial Interrogation of Murphy and Webster by TFO Grittman at Alma Station**

■ Defendants also move to suppress statements made during interviews with TFO Grittman at the Alma station on June 2, 2010, following the traffic stop. Because

Trooper Stahl improperly administered *Miranda* warnings to defendants at the scene of the traffic stop, TFO Grittman could not rely on those warnings and alleged waivers and continue the interrogation. Instead, he must have independently advised defendants of their rights and obtained valid waivers in order for the statements obtained at the Alma station to be admissible. While he testified that he fully advised defendants of their *Miranda* rights and obtained waivers from each defendant, that testimony is incredible in light of the written reports which fail to memorialize his independent administration of *Miranda* warnings. It is also very significant that TFO Grittman admitted that he had "gotten away from" using *Miranda* warning forms when conducting interrogations. It is clear from the record that he adhered to his practice of not using a *Miranda* warning form and gave no warnings at all. Based on the evidence submitted at the suppression hearing, the Government has not proven that defendants were properly Mirandized at the Alma station and waived their rights. Accordingly, all statements made by defendants during the interviews at the Alma station on June 2, 2010, will be suppressed.

c.  **Custodial Interrogation of Murphy by TFO Grittman at Wabaunsee County Jail**

■ Murphy did not specifically move to suppress statements made by him during an interview with TFO Grittman on June 3, 2010, at the Wabaunsee County Jail. However, based on the conclusion that defendants did not validly waive their rights alongside I–70 and that TFO Grittman did not himself administer *Miranda* warnings at the Alma station, he was re-

---

9.  How do you give up your *Miranda* rights and *not* talk to the officers? If you give up your *Miranda* rights you talk to the officers. If you assert your *Miranda* rights the officers may not talk to you.

quired to provide Murphy his *Miranda* rights at the jail prior to the interview. For the same reasons relating to the Alma station interviews, his testimony that he again provided *Miranda* warnings to Murphy and obtained a waiver prior to the Wabaunsee County Jail interview is discredited. His June 11, 2010, report includes absolutely no mention of *Miranda* warnings at the jail and there was no witness to the alleged warnings. For these reasons, Murphy's statements during the June 3, 2010, interview at the Wabaunsee County Jail were obtained in violation of *Miranda* and must also be suppressed.

## V. MOTION TO SEVER TRIAL

■■■ Defendant Webster also moves pursuant to Federal Rule of Criminal Procedure 14(a) and *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to sever the defendants for trial on the basis that a joint trial with defendant Murphy would result in a deprivation of Webster's rights under the Sixth Amendment. The Government opposes and contends that any potential Sixth Amendment issues can be cured by redaction rather than severance. Because all statements made by Murphy will be suppressed, there are no potential *Bruton* issues. Accordingly, defendant Webster's motion to sever his case for trial from defendant Murphy's will be denied.

## VI. CONCLUSION

Having considered the appropriate burdens of production and proof, the testimony of witnesses, the suppression hearing exhibits, the parties' written submissions, and having resolved issues of credibility, defendants' motions to suppress will be granted in their entirety.

Defendants satisfied their burden of production by establishing that the Honda Accord was seized when Trooper Stahl activated his *front* and/or *top* emergency lights and Webster pulled over in response to those lights. The Government failed to prove by a preponderance of the evidence a justification for the traffic stop. Based on the evidence admitted at the suppression hearing, Trooper Stahl had neither probable cause nor reasonable suspicion to believe that Webster violated a traffic law. Following the illegal seizure of the Honda Accord, he obtained consent from defendants to search the vehicle, but the taint from the initial illegal traffic stop had not dissipated such that the consent was a product of free will. As a result, all evidence seized from the Honda Accord will be suppressed as the fruit of the illegal traffic stop.

Webster and Murphy were in custody alongside I–70 when Trooper Stahl interviewed them. There is no evidence that Webster ever relinquished his rights and thus any statements made by him were in violation of *Miranda*. Further, the Government has failed to establish by a preponderance of the evidence that Murphy made a knowing and voluntary waiver. Trooper Stahl's misguided efforts at providing *Miranda* warnings precluded Murphy from understanding the nature and effect of relinquishing his rights and therefore his waiver was invalid. Accordingly, all statements made by Webster and Murphy alongside I–70 at the scene of the incident will be suppressed.

Because defendants never validly waived their *Miranda* rights alongside I–70, TFO Grittman was not permitted to continue the interrogation at the Alma station following the traffic stop without administering *Miranda* warnings and obtaining waivers. The Government did not demonstrate that he provided *Miranda* warnings prior to interrogating defendants and therefore all statements made at the Alma station were obtained in violation of *Miranda* and

will be suppressed. Likewise, Murphy's statements at the Wabaunsee County Jail on June 3, 2010, violate *Miranda* because there is no credible evidence that TFO Grittman ever advised him of his rights nor obtained a valid waiver prior to conducting the interview.

Finally, Webster's motion pursuant to Federal Rule of Criminal Procedure 14(a) to sever the defendants for trial will be denied as moot because all statements made by Murphy will be suppressed.

Accordingly,

it is ORDERED that

1. Defendants' motions pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C) as to the following evidence are GRANTED and this evidence SUPPRESSED:

(1) the 21 kilograms of cocaine and all other evidence seized from the gray 2002 Honda Accord on June 2, 2010;

(2) the statements made by Michael Murphy and Michael Webster alongside Kansas Interstate 70 on June 2, 2010;

(3) the statements made by Michael Murphy and Michael Webster at the Alma, Kansas Department of Transportation police facility on June 2, 2010; and

(4) the statements made by Michael Murphy at the Wabaunsee County Jail on June 3, 2010;

2. The Government is precluded from introducing the above at trial or making any reference to same;

3. Defendant Michael Webster's motion pursuant to Federal Rule of Criminal Procedure 14(a) to sever the defendants for trial is DENIED as moot; and

4. Trial is scheduled for June 6, 2011, in Utica, New York and pre-trial papers shall be filed on or before 12:00 noon on May 23, 2011.

IT IS SO ORDERED.