**11-2978-cr**
**United States v. Murphy**

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: June 18, 2012          Decided: December 4, 2012)

Docket No. 11-2978-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

       Appellant,

            v.

MICHAEL MURPHY, a/k/a Sealed Defendant, #1,
MICHAEL WEBSTER, a/k/a Sealed Defendant, #2,

       Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: CALABRESI, LYNCH, and LOHIER, Circuit Judges.

The Government appeals from an order of the United States District Court for the Northern District of New York (Hurd, <u>J.</u>), suppressing cocaine and other physical evidence uncovered during a search of the defendants' car, as well as post-arrest statements made by the defendants. The District Court found that the defendants' car was illegally stopped, that the consent to search the car was tainted by the illegal stop, and that the defendants did not waive their <u>Miranda</u> rights when they made the post-arrest statements. We AFFIRM.

> WILLIAM C. PERICAK, Assistant United States Attorney (Brenda K. Sannes, Daniel C. Gardner, Assistant United States Attorneys, <u>on the brief</u>), <u>for</u> Richard S. Hartunian, United States Attorney, Northern District of New York, Albany, N.Y., <u>for</u> Appellant.

KEVIN A. LUIBRAND, ESQ., Albany, N.Y., for Defendant-Appellee Michael Murphy.

TIMOTHY E. AUSTIN, Assistant Federal Public Defender (Molly Corbett, James Egan, Assistant Federal Public Defenders, on the brief), for Lisa A. Peebles, Acting Federal Public Defender, Albany, N.Y., for Defendant-Appellee Michael Webster.

LOHIER, Circuit Judge:

In 2010 a Kansas Highway Patrol ("KHP") trooper stopped a car along a highway in Kansas and discovered cocaine and other evidence after one of the defendants in the car, Michael Webster, consented to a search. Both defendants were arrested, eventually made inculpatory post-arrest statements, and were indicted. After a hearing, the United States District Court for the Northern District of New York (Hurd, J.) issued an order suppressing both the physical evidence seized during the car search and the defendants' post-arrest statements on the grounds that the trooper had illegally stopped the car, the subsequent consent to search the car was tainted by the illegal stop, the defendants were not properly informed of their rights under Miranda v. Arizona, 384 U.S. 436 (1966), and neither defendant waived those rights.

Relying principally on a videotape recording of the encounter, the Government appeals from the District Court's order, arguing that the defendants' car was never "seized" within the meaning of the Fourth Amendment and, alternatively, that the subsequent consent to search was untainted by the initial seizure. It also maintains that the Miranda warnings given to the defendants were valid. For the reasons that follow, we affirm.

**BACKGROUND**

A. **Factual Background**

The following facts are taken from the District Court's findings of fact and the record developed during the suppression hearing, including the videotape and audiotape recordings that were introduced as evidence.

1. The MVR Equipment

In June 2010, KHP Trooper David Stahl stopped a car driven by Webster, with defendant Michael Murphy as a passenger. Much but not all of the episode was recorded by a mobile video/audio recording ("MVR") unit installed between the front windshield and dashboard of Trooper Stahl's patrol car.[1] MVR units continuously capture and record footage to a DVD whenever a recording is started. There are various ways to start a recording: (1) activation of the patrol car's emergency lights or emergency siren, (2) activation of the trooper's wireless microphone, or (3) a collision involving the patrol car. MVR units are configured also to provide automatic "pre-event recording," so that "whenever an auto-record even[t] . . . happens, the footage actually recorded to the DVD will include what happened for approximately thirty seconds before the event that triggered the automatic recording."[2] Although a trooper can stop the MVR recording by turning off the patrol car's emergency lights, sirens, and wireless microphone, the parties agree that a trooper can also manually stop the MVR's recording function while leaving the patrol car's emergency lights on.

---

[1] Although the MVR captured most of the relevant events, no recording is available for one critical period of time—the vehicle actually halting—and the circumstances of that event are disputed.

[2] For example, if the patrol car's front emergency lights were turned on to pull over a car, the recording preserved on the DVD should show the car in question traveling in front of the patrol car for approximately thirty seconds before the emergency lights were activated.

## 2.  The Seizure and Search of the Car

On the day of the stop, Trooper Stahl put ruse drug checkpoint signs on the eastbound side of Interstate 70 ("I-70") in Kansas, so that they were visible to cars approaching exit 322 ("the Exit").  He then parked his patrol car in a turnaround lane connecting I-70's eastbound and westbound lanes.  From this position, Stahl could see the eastbound traffic approaching the Exit through his rearview mirror.

During the suppression hearing, Trooper Stahl provided contradictory testimony about what he did after pulling into the turnaround lane.  He first testified that he "turned [his] back lights on so that traffic coming along, when they see the signs, they see my lights up ahead" (emphasis added).  He later testified that he turned on his front emergency lights as he pulled into the turnaround.  In any event, the DVD from the MVR unit in Stahl's patrol car contains a 19-second "pre-event" segment that was automatically recorded because Stahl activated his emergency lights after pulling into the turnaround.  Stahl explained that he manually turned off the MVR unit after activating his emergency lights to avoid wasting film while he waited in the turnaround.

Shortly after parking in the turnaround, Trooper Stahl saw the defendants' car slow as it approached the ruse signs traveling eastbound, exit I-70 by the eastbound exit ramp, and then turn and begin driving up the opposite, westbound entrance ramp to the highway.  Stahl followed the defendants' car onto the westbound ramp, at which point the car stopped on the side of the ramp.

Precisely why the defendants' car stopped when it did remains the subject of heated dispute.  Webster testified that he stopped the car because he "noticed the lights on the [patrol

4

car's] front grill[e] were flashing, and [he] believe[d] the lights on the top of the vehicle were flashing." In contrast, Trooper Stahl testified that Webster stopped voluntarily and that the patrol car's rear emergency lights (which would not have been visible to Webster), rather than its front emergency lights, were activated.

During the roughly fifteen minutes after the car stopped, Trooper Stahl asked the defendants for proof of identification and other documents and asked the KHP to conduct record checks of the defendants, which revealed that over 52 pounds of marijuana were seized nine months earlier from a car in which Murphy was a passenger. In addition, according to Stahl, Webster appeared "tense and nervous" throughout the stop. Stahl also smelled fresh paint—a possible sign, he testified, that the car had recently been modified to conceal drugs. Moreover, Murphy provided contradictory information regarding the defendants' travel route, variously suggesting that they had traveled from Los Angeles and from Las Vegas.

The videotape recording of the stop, which we have reviewed, begins with the defendants' car, a Honda, already stopped on the entrance ramp, and Trooper Stahl's patrol car parked behind it. Reflections of white flashing lights are visible in the rear bumper of the Honda. Stahl is seated in the patrol car, apparently awaiting the KHP record checks, while the defendants remain in the Honda. While waiting, Stahl recorded an audio narrative of the events leading to that point, during which he clearly states that he "[s]topped this vehicle at I-70." Stahl testified that he initiated this recording by activating the MVR with his belt microphone when he returned to his patrol car after obtaining the defendants' identification and other papers.[3]

---

[3] Trooper Stahl also explained that, because of safety concerns, he did not have time to activate the camera before initially approaching the Honda.

After the record checks were completed, Trooper Stahl walked to the passenger side of the Honda, returned the defendants' papers, placed his hands on the car door, and told Webster that he was "just going to give [him] a warning on the [failure to] signal." Webster asked Stahl about getting gasoline, and Stahl answered that a gasoline station was 13 miles away. Stahl then took one step away from the Honda and began to turn toward his patrol car; but, after not more than two seconds, he leaned back into the Honda and asked the defendants if they would mind answering "a few other questions," explaining that there had been "a lot of problems with illegal narcotics" in the area. The defendants denied having drugs, but Webster consented to a search of the Honda.

We note that on the videotape, Trooper Stahl remained standing by the passenger-side car door from the time he approached the Honda to return the defendants' paperwork until he obtained Webster's consent for the search. Throughout, he kept his hands on the passenger-side door except for the second or so when he turned toward the patrol car. At the hearing, Stahl called his maneuver "the Kansas Two-Step," which, consistent with the videotape depiction of what occurred, he described as follows: "You break contact, give them their information back, tell them they are free to leave" and then immediately "come back" to continue questioning them. He explained that troopers are trained to break contact with the car momentarily "[b]ecause by law [drivers] have to feel free to leave to give consent to search."

After obtaining Webster's consent, Trooper Stahl asked the defendants to get out of the Honda. Stahl and another officer, who had by then joined him, quickly found a false compartment in the trunk. The defendants were arrested and forced to sit on the side of the entrance ramp near the front of the Honda; they waited there, handcuffed, while the officers

6

continued their search of the compartment, which eventually yielded twenty-one kilograms of cocaine, multiple cellular phones, and other evidence.

### 3. The Miranda Warnings

Approximately forty-five minutes after placing the defendants under arrest, Trooper Stahl gave them the following warnings:

> Okay, just so you guys understand, you have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to an attorney, if you cannot afford an attorney one will be presented for you by the court. You can decide at anytime to give up these rights, and not talk to us, okay. You understand that?

Murphy responded "I understand" and, when asked if he was willing to talk, said that Stahl could "go ahead and ask me a question, if I can answer it I will." Webster, by contrast, never indicated that he understood or even heard Stahl's warnings. Nonetheless, both defendants responded to Stahl's subsequent questions by denying knowledge of the compartment or the cocaine. Both defendants later made additional statements to a different officer after they were transported to a police station.[4]

---

[4] During the suppression hearing, KHP Trooper David Grittman testified that he administered Miranda warnings to the defendants before questioning them at the station. Webster disputed that Grittman had done so. The District Court resolved the dispute in defendants' favor, finding Grittman's testimony incredible at least partly because his contemporaneous police reports failed to mention Miranda warnings. Because the Government has not appealed this finding, we review only the validity of Trooper Stahl's initial Miranda warnings and the defendants' purported waiver of their rights at that time.

7

B.     **Procedural History**

The defendants were charged with conspiring to distribute over five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  Before trial, they moved to suppress the cocaine as well as the statements they made to the police.  They argued that (1) their car was unlawfully stopped without cause, (2) their consent to the car search was involuntary because it was tainted by the prior unlawful stop, and (3) Trooper Stahl's Miranda warnings were improper and invalid.

After a two-day suppression hearing, the District Court granted the motions to suppress. First, it found that "the Honda . . . was seized when Trooper Stahl activated his front and/or top emergency lights and Webster pulled over in response to those lights."  United States v. Murphy, 778 F. Supp. 2d 237, 260 (N.D.N.Y. 2011).[5]  Second, it refused to credit Stahl's testimony that he had observed the Honda commit a traffic violation, and it ultimately concluded that the Government had "offered no . . . objectively reasonable basis to justify the stop."  Id. at 255. Third, it found that the defendants' subsequent consent to search remained tainted by the initial unlawful seizure.  Id. at 256-57.  As for the post-arrest statements, the District Court concluded that neither defendant had knowingly waived his Miranda rights.  Id. at 258-59.

The Government appealed.

---

[5] The Government later moved for reconsideration, contending that the District Court's findings regarding the seizure were contradicted by the MVR videotape recording, and seeking leave to reopen the suppression hearing to introduce evidence of Murphy's prior familiarity with Miranda warnings and to permit Trooper Stahl to correct his earlier testimony that the flashing lights visible in the Honda's rear bumper were from the patrol car's front emergency lights.  The District Court denied the motion.  Although the Government appealed the order, its only arguments regarding that order appear in two footnotes to its brief.  We consider its perfunctory arguments to be abandoned.  See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 107 (2d Cir. 2012).

**DISCUSSION**

In evaluating the grant of a motion to suppress evidence, "we review the district court's factual findings for clear error and its conclusions of law de novo." United States v. Awadallah, 349 F.3d 42, 71 (2d Cir. 2003) (quotation marks omitted). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. When, as here, credibility determinations are at issue, we give particularly strong deference to a district court finding." United States v. Iodice, 525 F.3d 179, 185 (2d Cir. 2008) (citations, quotation marks, and alteration omitted). Where a defendant's motion to suppress is granted, we review the evidence in the light most favorable to the defendant. See Awadallah, 349 F.3d at 71; see also United States v. Moore, 670 F.3d 222, 226 (2d Cir. 2012) (the record should be viewed in the light most favorable to the government only "[w]hen reviewing a district court's decision in the government's favor on a motion to suppress" (emphasis added)).

With these general principles of review in mind, we conclude that (1) the District Court's finding that Trooper Stahl stopped and thereby seized the Honda was not clearly erroneous, (2) the taint of the unlawful seizure had not dissipated at the time Webster consented to the search of the car, and (3) the District Court did not err in concluding that neither defendant waived his Miranda rights.

A. **The Unlawful Seizure of the Honda**

The Government submits that the District Court erred in finding that Trooper Stahl stopped (and therefore "seized") the Honda when he activated his front and/or top emergency

9

lights. Both sides rely on evidence in the form of the MVR videotape recordings, as well as testimony or affidavits from Webster, Stahl, and others.

During the suppression hearing, Trooper Stahl testified, and the Government argued, that he pulled out of the turnaround to intercept the defendants' car because he observed it exit without signaling, in violation of a Kansas law that requires drivers to signal within a hundred feet of a lane change or turn. Webster testified, however, that he signaled as he approached the exit. The District Court resolved this factual dispute in favor of the defendants, finding Stahl's testimony incredible "in light of the overwhelming physical evidence demonstrating that Trooper Stahl could not have actually observed Webster fail to signal." Murphy, 778 F. Supp. 2d at 245. The Government has not pursued this argument on appeal, and we are left to accept that Stahl had no legal basis to conduct a traffic stop.

Instead, on appeal, the Government contends that Trooper Stahl did not actually conduct a traffic stop and that the defendants' car stopped voluntarily, without prompting from the patrol car. Although the MVR did not capture the moment the Honda actually stopped, based on our review of the record evidence we cannot say that the District Court clearly erred in finding that Stahl conducted an unjustified traffic stop of the Honda by activating the patrol car's "front and/or top emergency lights." Indeed, we would be hard pressed to do so given (1) Webster's testimony, which the District Court credited, that Stahl's flashing lights forced him to stop the Honda, (2) the videotape confirming the reflection of white flashing lights on the Honda's rear bumper shortly after it pulled over, (3) Stahl's testimony that his patrol car's front emergency lights caused the reflection, and (4) Stahl's near-contemporaneous descriptions of the encounter as a "traffic stop" in his audio narrative and related paperwork. "'[W]here there are two

10

permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" Bennett v. United States, 663 F.3d 71, 85 (2d Cir. 2011) (quoting Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)).

The District Court made its factual findings after hearing from all the witnesses and making credibility determinations. The Government argues that we can nevertheless find clear error because it is physically impossible, given the video recording, for events to have transpired as the District Court found. More specifically, the Government contends that it is impossible for the patrol car's front emergency lights to have been activated without also activating the MVR's auto-record feature and generating pre-event footage of the Honda in motion, or causing visible red and blue reflections from the patrol car's top emergency lights to be visible in either the patrol car's windshield wipers or hood. It argues that the absence of any footage of the Honda in motion or red and blue reflections on the windshield wiper or hood demonstrates that the front emergency lights were off. These arguments fail for two reasons. First, Trooper Stahl testified that KHP troopers have the ability to turn off the MVR while leaving the patrol car's emergency lights on, and that just before stopping the Honda he had "to turn it off to sit with my lights going without wasting film." If the patrol car's front emergency lights were already on when he pulled out of the turnaround, the MVR's pre-event recording feature would not have been activated prior to the stop.[6] See Gov't App'x at 115-16. Second, the videotapes of the incident involving the Honda, as well as other videotapes designed to show the reflective effect of activated patrol car emergency lights in various conditions and on various surfaces, are either

---

[6] There was some evidence that troopers are unable to prevent MVR units from recording while the emergency lights are on. Trooper Stahl testified to the contrary, however, and at oral argument on appeal the Government acknowledged that troopers may be able to deactivate the MVR while leaving the emergency lights on. Tr. of Oral Arg. at 34-35.

11

inconclusive or squarely contradict the Government's argument, since several show no red or blue reflections even when a patrol car's emergency lights are activated. Given these ambiguities in the record, we reject the Government's contention that the videotape is conclusive.

Accordingly, we discern no clear error in the District Court's factual findings regarding Trooper Stahl's seizure of the defendants' car, and we proceed on the understanding that the Honda was unlawfully seized.

B. **The Taint of the Unlawful Seizure**

The Government next argues that, even if the Honda was unlawfully stopped, the physical evidence that the troopers found is admissible because Webster's consent to search constituted an intervening independent act of free will unconnected to the stop. We disagree.

When consent to search is preceded by an unlawful government seizure, the evidence obtained from the search must ordinarily be suppressed unless the Government shows both that the consent was voluntary and that "'the taint of the initial [seizure] has been dissipated.'" United States v. Snype, 441 F.3d 119, 132 (2d Cir. 2006) (quoting United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990)). "[T]he question of whether a person's statement has been purged of the taint of prior official illegality does not hinge on a simple but for analysis, but rather must be answered on the facts of each case." Id. at 134 (quotation marks omitted). We consider four factors relevant to the analysis: (1) whether Miranda warnings were given, (2) the "'temporal proximity'" of the prior illegal act to the consent, (3) "'the presence of intervening circumstances,'" and (4) "'the purpose and flagrancy of the official misconduct.'" Id. (quoting Kaupp v. Texas, 538 U.S. 626, 633 (2003)).

12

The "first factor is most relevant where the person giving consent is in custody." Id. Because Webster consented to the search while the defendants remained seated in the car and were not yet in custody, at this juncture we can elide the absence of Miranda warnings and focus instead on the remaining factors.

The second factor, temporal proximity, favors the defendants. About fifteen minutes elapsed between the seizure of the Honda and Webster's consent, but the bulk of that time involved the unlawful traffic stop itself. Less than one minute passed between what might fairly be characterized as the end of the unlawful seizure—Trooper Stahl's return of the defendants' documents—and Stahl's request for consent to search the car. And only a few seconds elapsed during Stahl's execution of the "Kansas Two Step," which was the only time he moved away from or broke contact with the car. We recognize that even a brief lapse of time can sometimes suffice to "sever the causal connection between an illegal [seizure] and a subsequent consent to search, thereby permitting a court to conclude that the consent fairly reflects an act of free will." Id. Here, however, the lapse of less than one minute between the end of the stop and the consent to search occasioned by the "Kansas Two-Step" favors the defendants. See Kaupp, 538 U.S. at 633 (suppressing confession where there was "no indication from the record that any substantial time passed" between unlawful arrest and confession); Oguns, 921 F.2d at 447 ("[T]he short lapse of time between the illegal entry and consent, amounting only to a few minutes, did little to dissipate the taint of the illegal entry."); United States v. Ceballos, 812 F.2d 42, 50 (2d Cir. 1987) ("[T]he consents to search . . . given within a few minutes of the illegal arrest . . . were too closely connected in context and time to the illegal arrest to break the chain of illegality.").

13

The third factor, the presence or absence of intervening events, also favors the defendants. Trooper Stahl never informed the defendants that the stop was over, that they were free to go, or that they did not have to consent to a search.  Throughout the encounter, Stahl remained by the car door, removing his hands from it for only a moment after he returned the defendants' paperwork, told Webster he was receiving only a warning, and spoke to the defendants about the nearest gasoline station.  We doubt that a reasonable person would have felt free to go at that moment, and we do not view Stahl's act of briefly turning away from the car as an "intervening event" that removed the taint of the initial seizure.  See Taylor v. Alabama, 457 U.S. 687, 690 (1982).

In urging otherwise, the Government asks us to consider Trooper Stahl's calm and respectful manner during the encounter.  It is true that, in Snype, for example, we noted that the party consenting to the search had been treated "with respect" while the officers sought consent, and that the "fearful atmosphere" had been replaced by then with one of "relative calm."  441 F.3d at 135.  In that case, however, consent came from a third party who "knew that she was not required to consent to any search" and whose consent was preceded by the defendant's arrest and removal from the premises, the departure of a SWAT team from the premises, and the unequivocal restoration of the third party's liberty.  Id.  Here, by contrast, the defendants' liberty was not clearly restored, and Stahl's respectful and calm demeanor, which remained constant throughout the encounter, was hardly an intervening change in circumstance sufficient to dissipate the taint of the unlawful seizure.

Last, we consider the flagrancy of the police misconduct.  Some of our sister circuits have held that purposeful and flagrant police misconduct exists where "'(1) the impropriety of

14

the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed "in the hope that something might turn up."'" United States v. Fox, 600 F.3d 1253, 1261 (10th Cir. 2010) (quoting United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006)). The District Court found that Trooper Stahl had not "intentionally committed any misconduct." Murphy, 778 F. Supp. 2d at 257. It noted, however, that "there is certainly evidence that his motivation for pulling the Honda . . . over was merely its exit from I-70 in the presence of drug checkpoint signs," and that "[a]t worst, [Stahl] appears to have tailored his testimony in an attempt to justify the stop and search."[7] Id. We have no reason to disagree with the District Court's ultimate assessment that Stahl's stop of the car, however troubling, did not rise to the level of intentional misconduct. That said, the finding obviously represented a close call for the District Court, and we therefore view this fourth factor as one that does not strongly favor the Government.

In sum, weighing the four factors together, we conclude that the District Court correctly ordered the suppression of the evidence discovered during the search of the Honda after determining that the taint of the unlawful seizure persisted when Webster consented to the search.

---

[7] Stahl acknowledged that a vehicle's exit from the highway near ruse drug checkpoint signs, standing alone, does not create reasonable suspicion for a stop. Also, Stahl's various observations—that Webster appeared nervous, that Murphy provided inconsistent answers about their travel route, and that the car smelled of fresh paint—might have aroused reasonable suspicions of drug activity by the time he asked for consent to search the car, but those observations were made after the stop and therefore cannot justify the initial seizure.

15

## C.   **Miranda Rights**

We next turn to the District Court's suppression of the defendants' post-arrest statements. "The purpose of the Miranda warning is to ensure that the person in custody[8] has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007).  The Government bears the burden of proving by a preponderance of evidence that a valid waiver occurred.  Berghuis v. Thompkins, 130 S. Ct. 2250, 2261 (2010); United States v. Male Juvenile, 121 F.3d 34, 39 (2d Cir. 1997).  The waiver inquiry has two components: the accused's relinquishment of his rights must have been (1) "'knowing,' which is to say that 'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it,'" and (2) "'voluntary,' which is to say 'that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'"  United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)); see United States v. Hall, 724 F.2d 1055, 1059 n.6 (2d Cir. 1983) (Friendly, J.) (noting that both knowledge and voluntariness are necessary for waiver, and that "a waiver of rights could not be found unless the suspect knew what they were").  Because we conclude that the defendants' waivers were not knowing, we focus only on that component.

### 1.  Michael Murphy

Construing Trooper Stahl's Miranda warnings as an "incomprehensible instruction on waiver," the District Court suppressed Murphy's post-arrest statements because the Government

---

[8] The defendants, handcuffed by the side of the car, clearly were in custody at the time Trooper Stahl gave them the Miranda warnings.

16

failed to show that Murphy fully understood the rights he was waiving or the consequences of the waiver. Murphy, 778 F. Supp. 2d at 259. On appeal, the Government concedes that it was technically incorrect for Stahl to instruct the defendants that they could "decide at anytime to give up these rights, and not talk to us" (emphasis added), but it nevertheless argues that Murphy's responses show that he understood his right to remain silent and to counsel. We cannot agree.

Trooper Stahl's incorrect formulation strongly suggested that the defendants should talk if they wished to exercise their rights—or, put another way, that they would waive their rights if they remained silent. By contrast, when correctly given, Miranda warnings clarify that a defendant may choose at any time to waive his rights or maintain those rights, including the right to remain silent. As given, Stahl's warning confused waiver with the exercise of the defendants' rights. It thereby failed to "ensure that the person in custody ha[d] sufficient knowledge of his . . . constitutional rights relating to the interrogation." Carter, 489 F.3d at 534.

As the Government points out, Murphy answered affirmatively when asked if he understood the administered warnings. But this proves nothing more than that Murphy understood Trooper Stahl's words. It does not show that he understood his actual rights under Miranda. Even assuming, therefore, that Murphy voluntarily decided to answer Stahl's questions, we agree with the District Court that the waiver was not knowing. See Murphy, 778 F. Supp. 2d at 259.

In reaching this conclusion, we do not suggest that any slight variance from the standard Miranda warnings will necessarily invalidate a defendant's waiver of his or her Miranda rights. See Duckworth v. Eagan, 492 U.S. 195, 202-03 (1989) (recognizing that "no talismanic

17

incantation is required to satisfy [the] strictures" of <u>Miranda</u> (quotation marks and alterations omitted)). The relevant "inquiry is simply whether the warnings reasonably 'convey to a suspect his rights as required by <u>Miranda</u>.'" <u>Florida v. Powell</u>, 130 S. Ct. 1195, 1204 (2010) (alterations omitted) (quoting <u>Duckworth</u>, 492 U.S. at 203). But the substance of the warnings here was confusing enough to cast serious doubt on whether Murphy understood his rights.

2. <u>Michael Webster</u>

We likewise conclude that Webster did not knowingly waive his rights under <u>Miranda</u>. Indeed, Webster's case for suppression is stronger, since he appears never to have acknowledged the incorrect <u>Miranda</u> warnings, and there is no record evidence that he heard Trooper Stahl give the warnings. To the contrary, Webster testified that he "wasn't listening" to Stahl at that point,[9] and, as the District Court found, Stahl did not know whether Webster acknowledged hearing the <u>Miranda</u> warnings.[10]

Nevertheless, the Government contends that Webster's failure to acknowledge the <u>Miranda</u> warnings is immaterial because he implicitly waived his rights when he responded to Trooper Stahl's later questioning. In essence, the Government asks us to infer Webster's waiver based solely on the fact that Stahl read the warnings in a clear voice while standing near him. A broad rule supporting a finding of waiver whenever <u>Miranda</u> rights are given within a defendant's earshot is without precedent in this Court. Although a defendant's waiver "may be

---

[9] Webster acknowledged that, at the police station, he told Trooper Grittman that he had already been read his rights, but he explained that he said this because he "heard Mr. Murphy sa[y] he understood his rights."

[10] Webster also argues that the <u>Miranda</u> warnings were deficient because Trooper Stahl did not adequately explain that counsel could be made available during the interrogation. We need not address this argument because we conclude that Webster did not knowingly waive his <u>Miranda</u> rights.

18

implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver,'" <u>Berghuis</u>, 130 S. Ct. at 2261 (quoting <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979)), the Government must do more than show simply that a <u>Miranda</u> warning was given and the accused thereafter made a statement.  We may imply waiver only when the prosecution has made "the additional showing that the accused <u>understood</u> these rights."  <u>Id.</u> (emphasis added).  On this record, the District Court properly concluded that the Government failed to show that Webster waived his <u>Miranda</u> rights.

## CONCLUSION

For the foregoing reasons, we AFFIRM the District Court's order.