The Facts as Found by the Court
The First Fight
At 12:14 PM on December 19, 2017, video surveillance cameras facing the south side of West 151st Street just west of Eighth Avenue (GX 2) recorded a group of individuals-Erica Puello (Defendant's girlfriend) and her friends Mike and Day Day, together with Ty/Red Stripe-who were talking near the corner. Defendant approached them; he was wearing light tan pants and a black jacket.
Erica testified that she and Defendant had been fighting on the morning of December 9. When she saw Defendant, she threw something (she testified that it was Defendant's cell phone) into the street. Defendant responded by grabbing Erica's jacket while she leaned against a parked car. Defendant yelled at Erica while tussling with her.
Ty then approached the two of them. According to Erica, he punched Defendant in the face, "at least one good time," and then "Ty looked like he was going to pull something out of his pocket which was a gun." (Tr. 124). The surveillance camera only depicts the participants from the waist down. It is apparent from the video that Defendant (who is recognizable because of his tan pants) backs away from Ty.
*478 It is undisputed that no police officer witnessed this violent encounter.
What Happened to Ty/Red Stripe Thereafter
After Defendant retreated from Ty/Red Stripe, someone handed him his jacket, which he had dropped during the encounter. The jacket is recognizable by its bright orange lining (GX 2 at 12:14:55 PM).[1] Defendant then turned the corner (GX 2 at 12:15 PM) and walked south on Eighth Avenue. His retreat was captured by a surveillance camera that depicts the northwest corner of West 151st and Eighth Ave., facing north toward West 151. (GX 4).
By looking at the footage from two different surveillance cameras, GX 2 and GX 4, one can see that Ty and Defendant continued to shout at each other, back and forth-Defendant turning back toward Ty, who was on West 151st Street; Ty rounding the corner to come after Defendant on Eighth Avenue-for a few seconds after their physical encounter ended. This occurred between 12:15:00 and 12:15:24 PM. During this "verbal altercation," Defendant clearly had one hand in his hoodie pocket, while swinging his jacket (the one with the bright orange lining) with the other. On one of the surveillance cameras, it does not appear that he is pressing either arm (including the one with the hand in his pocket) close to his side; from the other camera, the position of his arm is less clear.
One of Erica's friends, Mike, tried to restrain Ty from chasing Defendant down Eighth Avenue. However, GX 4 shows Ty following Defendant south on Eighth. At 12:15:28 PM (GX 3), Defendant can be seen crossing from the west side to the east side of Eighth Avenue, while Ty continues to walk south down the west side of Eighth Avenue. Both men then disappear from all cameras.
Just under one minute later, at 12:16:14 PM, Ty reappears on GX 4, walking west out of the Eighth Avenue street bed onto the sidewalk; he emerges next to the pay phone that sits on the west side of Eighth just south of the corner of West 151st Street. There is no way of knowing how Ty got into the street; no testimony or surveillance camera footage reveals whether he followed Defendant across the street and then returned, or simply walked down the west side of Eighth and then circled back.
By 12:16:26 PM, Ty had returned to West 151st Street, just around the southwest corner from Eighth Avenue, where Erica, Mike and Day Day were hanging out. He remained with them, talking, smoking, laughing, and checking cell phones, for nine minutes (GX 2). From time to time throughout their conversation, he went to the corner and looked south; this can be seen from both GX 2 and GX 4. Ty is continuously seen on one or both of these surveillance cameras throughout this nine minute period.
At 12:25:20 PM, footage from GX 2 reveals that Ty wandered one last time toward the southwest corner of West 151st and Eighth. On the GX 4 footage, Ty and Mike, later joined by Day Day, can be seen standing on the SW corner of West 151st and Eighth, looking south. Ty turns and leaves the corner at 12:25:30 PM (GX 4). At 12:25:36 PM (GX 2), he starts running west on West 151st Street. He disappears from view.
At 12:28:40 - three minutes after he ran west down West 151st Street -- Ty reappears on the GX 4 surveillance video, walking *479 north on Eighth Avenue. He does not appear to be hurrying down the street. He stopped on the southwest corner of West 151st Street and Eighth Avenue and spent nearly one minute talking with Day Day, Mike and Erica, who were still hanging out there. During this conversation, Erica appears to point out a rip in Ty's jacket.
Ty then crossed West 151st Street, heading north. He disappears from view-this time for good-at 12:30:25 PM (GX 4).
Defendant cannot be seen during any of this. In fact, from the time he crosses Eighth Avenue at 12:15:28 PM until 21 minutes later, Defendant is not picked up on any surveillance camera.
What Strachon Says He Did During Those 20 Minutes
Strachon submitted a declaration (which was not cross examined), in which he gave his account of what happened after he left the scene of his altercation with Ty/Red Stripe.
Strachon averred that, after being accosted, punched and threatened with a gun by Ty/Red Stripe on West 151st Street, he crossed Eighth Avenue. This, obviously, is confirmed by the surveillance video. (GX 4 at 12:15:28 PM). He further averred that he remained on the east side of the street until he was confident that Ty/Red Stripe was no longer in the vicinity.[2] Then Strachon went to his grandfather's apartment (where he was living at the time), which was located on or near the northwest corner of Eight Avenue and 150th Street. (Strachon Second Declaration, ECF Doc. 14-1 at ¶¶ 2, 5, 6). There, he changed into different clothes (including a different jacket, the one with the bright orange lining having been torn in the fight) and retrieved a gun from his closet-ostensibly for his own protection in case he should encounter Ty/Red Stripe again. (Strachon Second Declaration ¶ 6).
I credit Defendant's testimony that he returned to his apartment at some point after the fight, changed his clothes (including his jacket) and retrieved the gun. What makes this believable is that, when we next see Strachon on video surveillance, he appears to be wearing a different jacket. As noted above, during the fight with Ty, Defendant had a jacket with a very distinctive orange lining. The jacket is zipped up and the lining is barely visible on the surveillance videos taken from GX 3 and GX 4 and after 12:36 PM, but what little can be seen certainly does not appear to be bright orange. This tends to confirm that Defendant did indeed return to his apartment after his fight with Ty.
Strachon originally averred that he spent 30 minutes in his apartment. (Strachon First Decl., ECF Document 13-2 at ¶ 5). He then filed a second, "updated affidavit," in which the reference to 30 minute is deleted; the updated affidavit is silent about how long he remained in the apartment (See Strachon Second Decl.).
I do not know exactly when Defendant went into the apartment or exactly how long he was there. But he could not possibly have been in the apartment for 30 minutes, or even for 20. I reach this conclusion as follows: If Strachon (1) waited on the east side of Eight Avenue until Ty disappeared around the corner of West 151st Street and Eighth Avenue (12:16 PM), and then stayed there long enough to assure himself that Ty was "not in the vicinity;" (2) then walked back across *480 Eighth Avenue and down to the corner of West 150th, where the apartment was located; and (3) entered his building and accessed his apartment, Defendant could not have gotten into his apartment until about 12:19 PM at the earliest. He is next captured on a video surveillance camera (GX 3, which looks south down Eighth Avenue and captures an area beginning at the middle of the block) at 12:36:05 PM, so he was back on the street before that time. As will be seen, I conclude that Strachon was in his apartment for less than 10 minutes.
Strachon's account of the interval between his fight with Ty and his arrest does not include any second, entirely verbal altercation with Ty. Indeed, Defendant takes the position that he never encountered Ty again after backing away from him following their fisticuffs on West 151st Street shortly after 12:14 PM. (See Def. Brief at 8). According to Defendant, either the verbal altercation that underlies the Government's reasonable suspicion argument never happened at all, or it was the altercation that occurred at the end of their physical fight, at 12:15 PM, on the southwest corner of West 151st Street and Eighth Avenue.
Two Officers Go to Lunch and One Saw a Fight
On December 19, 2017, Detective Christopher Van Weddinger and his partner for the day, Deputy Chief Chris McCormack, left the Police Service Area 6 station, located at West 148 Street and Eighth Avenue, to pick up lunch. Notwithstanding the fact that both officers were on duty, they failed to take with them either a police radio or handcuffs. The testimony does not reveal what time they left the station house.
After they picked up lunch, the two officers were driving past the vicinity of West 150th Street and Eighth Avenue when Van Weddinger saw two men having a "heated argument." (Tr. 18). The argument was taking place on the corner of West 150th Street and Eighth Avenue (Tr. 35-36). The two men were Defendant and Ty/Red Stripe.
Van Weddinger then saw Ty/Red Stripe walk north on Eighth Avenue.
Det. Van Weddinger testified that he came to believe that Defendant (the man wearing tan pants) might be carrying a gun. The basis for his belief was that the Defendant had his elbow and upper arm tucked tightly against his side (Tr. 18).
It is undisputed that Van Weddinger did not see a gun or any object that looked like a gun. Van Weddinger admitted at the hearing that he never saw a gun or a bulge (Tr. 19); he also denied seeing Defendant with his hand in his pocket, or making any sort of threatening gesture (Tr. 37, 42). What he did see, Van Weddinger testified, did not constitute a crime. (Tr. 36).
According to Van Weddinger, the man with the tan pants followed Ty/Red Stripe north on Eighth Avenue "a short time later." (Tr. 39). In response to questioning from the court, Van Weddinger said that, by "a short time later," he meant two or three minutes-not immediately, but not a long time later, either. (Tr. 40). Van Weddinger testified that Defendant walked "quite briskly" up Eighth Avenue after Red Stripe, and that he and his partner concluded that Defendant was "possibly looking for" the man with the red striped pants. (Tr. 24; see also Tr. 39). Their conclusion suggests that Defendant left the corner not too long after Ty/Red Stripe did.
I have no idea whether Van Weddinger and his partner were driving throughout his observation; whether they were stopped at a stoplight; or whether, once Ty and Strachon had called themselves to Van Weddinger's attention, the officers pulled their car over and positioned themselves to watch what was going on for a longer *481 period. The Government did not ask. The only testimony is that Van Weddinger saw what he saw while he and his partner were "driving." That suggests to me that the officers were in a moving vehicle.
Van Weddinger Calls for Back Up
At 12:32, Van Weddinger placed a call from his personal cell phone to the personal cell phone of Det. Anthony Chow, who was back at the station. This call, according to Chow, lasted "maybe a minute." (Tr. 51).
Van Weddinger advised Chow in this initial call that he had seen a heavy set male black with a black beard, black knit cap, tan pants and a black jacket having an argument with another man, and that the man with tan pants "might possibly have a gun." (Tr. 23). Van Weddinger was quite emphatic that he did not say the man had a gun; he told Chow only that the man "might possibly" have a gun. (Tr. 37).
According to Van Weddinger, he did not place this call "immediately" after witnessing the verbal altercation. However, Van Weddinger could not say how much earlier the altercation had taken place. Because "I really don't know how much time passed" (Tr. 34) between the time he saw what he saw and the time he called Chow, Van Weddinger could not disagree with defense counsel's suggestion that it could have been as long as long as fifteen minutes prior to his placing the call for back up. (Tr. 34). However, Van Weddinger never affirmatively testified that fifteen minutes passed before he placed that call. Elsewhere, he testified that it was "briefly" (Tr. 33)-testimony that is inconsistent with a fifteen minute gap between seeing the argument and calling for backup.
Defendant is Accosted and Arrested
As soon as cell phone call from Van Weddinger ended, Chow and his partner, Det. Bonilla, left the station, got into Chow's unmarked car, and went to look for the Defendant. Both were in plainclothes.
At 12:35:48 PM, Chow called Van Weddinger from his cell phone (again, not from a police radio). He placed the call on speaker phone so that Bonilla could hear what Van Weddinger was saying. The line was open for 268 seconds (4 minutes and 28 seconds); someone finally hung up the phone at 12:40:16 PM.
We have three different accounts of what Van Weddinger said during this telephone call.
Van Weddinger testified that he told Chow and Bonilla that he had seen a man in tan cargo pans engaged in a verbal altercation, and that this man "possibly could be carrying a firearm," because at some point he had "his arm tucked tightly to his side." (Tr. 37).
Chow testified that Van Weddinger said that "a male was having a dispute with another in the street" (Tr. 50), and that, "the person had his arms and his hand in his pocket, gesturing as if he had a firearm ." (Tr. 50) (Emphasis added). Van Weddinger specifically denied seeing either Strachon's hand in his pocket or any threatening gesture (Tr. 37), which makes Chow's testimony inconsistent with Van Weddinger's. However, Chow testified that Van Weddinger said that the man "may possibly" have a firearm (Tr. 50); to that extent, his testimony is consistent with Van Weddinger's testimony.
Bonilla testified that, during the cell phone conversation, which he heard over the speakerphone, Van Weddinger said that he had seen the buttstock of a gun sticking out of Defendant's sweatshirt (Tr. 81, 88, 92-93).
I do not credit Bonilla's testimony at all.[3] Neither Van Weddinger nor Chow testified that Van Weddinger, during the phone call, claimed to have seen the buttstock *482 of a gun. Both testified that Van Weddinger said the man "might possibly" have a gun. On this point, I credit the testimony of Van Weddinger and Chow. And because I do not credit Bonilla's testimony, the Government cannot rely on it to justify Bonilla's conduct vis a vis Defendant.
Chow drove west on 147th Street to Bradhurst, turned north onto Bradhurst and went to 150th Street, turned eastbound on 150th, then turned north on Eighth Avenue. At that point, Chow's car was facing northbound near the southeast corner of 151st Street and Eighth Avenue. Van Weddinger's car was facing southbound at the stoplight at 151st Street and Eighth Avenue.
Meanwhile, Strachon emerged on southernmost video surveillance footage at 12:36:05 PM (GX 3). At that point he was walking north, about halfway between West 150th and West 151st, on the west side of Eighth Avenue. He passed Erica, Mike and Day Day, who were standing on the Southwest corner of Eighth Avenue and West 151st Street at 12:36:15 PM (GX 4). He then crossed to the northwest corner of West 151st Street and Eighth Avenue, walked a short distance north, and turned into a storefront at 12:36:19 PM (GX 4). He re-crossed south at the same intersection at 12:38:00. (GX 4)
This placed Strachon in the sights of the officers who were arriving at the scene. Chow testified that, when he and Bonilla arrived at the southeast corner of Eighth Avenue and West 151st Street, he looked to his left and saw Defendant talking to some people on the southwest corner of Eighth Avenue and West 151st Street. According to the surveillance camera, that is exactly what Strachon was doing between 12:38-12:39 PM; he spent almost a minute pacing on the corner, smoking a cigarette and talking to Erica. (12:38:03-12:38:58 PM, see GX 4). According to Erica, he ended the conversation by telling her to go home. (Tr. 131).
During this entire period the police officers were talking on an open call phone line. The long minute that Strachon spent talking to Erica gave them plenty of time to craft a strategy for confronting him. Bonilla was to walk across the street; Chow would do a "u" turn and Van Weddinger would drive through the light to position his car behind Chow's; they would all confront Defendant and "stop [him] for an interview." (Tr. 53, 82).
Strachon turned south after parting from Erica. He stopped to shake hands with someone at exactly 12:39:00 PM (GX 4). He then resumed walking south toward West 150th Street on the west side of Eighth Avenue.
Bonilla got out of the car and started walking across Eighth Avenue at an angle designed to intercept Defendant. (GX 5).
Defendant was several storefronts south of the SW corner of West 151st and Eighth when, at 12:39:18 PM (GX 5), Bonilla-who was in plainclothes, and who admits that he did not have his badge displayed (Tr. 102)-intercepted Defendant and grabbed him by the front of his jacket. Defendant flinched. There was some sort of verbal interchange-according to Bonilla, this is when he identified himself as a police officer (Tr. 105)[4] -which lasted for two seconds, *483 until 12:39:21. At that point Bonilla grabbed Defendant's arms; Strachon started to push back; Bonilla pushed Strachon back into the doorway of the shop; Defendant fell to the ground, and Bonilla flipped him and twisted his arms behind his back. The entire takedown from interception to Bonilla's having Strachon's arms behind his back, took 15 seconds, or until 12:39:33. (GX 5).
While this was going on, Van Weddinger drove up, got out of his car, tripped, fell and broke his leg. Chow first assisted Van Weddinger, then helped Bonilla handcuff Defendant.
Recovering the Gun
Chow and Bonilla told slightly different stories about how they came to recover the gun from Defendant. The difference is insignificant.
According to Bonilla, he asked Defendant "Do you have anything on you you shouldn't have?" (Tr. 112), whereupon Strachon replied, "Yes, take it out of my fucking pocket," whereupon Bonilla removed the gun-which could not be seen-from Defendant's pocket.
According to Chow, as they were cuffing him, Strachon said, "I fucked up; I fucked up. Just take it out of my pocket," whereupon Chow looked down and the butt of the gun handle could be seen sticking out of Defendant's jacket pocket. Bonilla removed it.
Erica, who witnessed the entire incident from the corner, saw the detectives remove the gun from Strachon's person. (Tr. 133:20-21).
When Bonilla approached Defendant, he was relying entirely on the information they received from Van Weddinger. He and Chow had no independent basis to suspect that anything about Defendant was amiss. (Tr. 64, 89). They did not see any gun; they did not see any bulge; they did not see the Defendant engaged in any threatening conduct, or making any threatening gestures. (Tr. 42, 63-64, 101, 111).
Conclusions of Law
Once the movant establishes some basis for the suppression motion, the burden of proof shifts to the Government, which then carries the burden to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment. U.S.C.A. Const.Amend. 4. United States v. Murphy , 778 F.Supp.2d 237 (N.D.N.Y. 2011), aff'd. , 703 F.3d 182 (2d Cir. 2012). Defendant's affirmation established the necessary basis for a hearing and put the Government to its proof.
Van Weddinger's testimony about what he saw and what he told his fellow officers categorically rules out any possible finding of probable cause to arrest. "Probable cause to arrest exists when the officers have ... reasonably trustworthy information as to [ ] facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been ... committed by the person to be arrested." Zellner v. Summerlin , 494 F.3d 344, 368 (2d Cir. 2007). Van Weddinger testified that he saw no crime; he testified to nothing that would rise to a probable cause standard.
Therefore, I will analyze the credible evidence to decide whether the police had the reasonable suspicion necessary to accost Defendant on a " Terry stop."
Terry and its Progeny
In 1968, the United States Supreme Court expressly recognized that the government's interest in "effective crime *484 prevention and detection," as well as in officer and public safety while pursuing criminal investigations, could render it constitutionally reasonable "in appropriate circumstances and in an appropriate manner" to detain a person temporarily, and even to pat him down for weapons "even though there is no probable cause to make an arrest." Terry v. Ohio , 392 U.S. 1, 22-25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The circumstances necessary to justify a Terry stop are a reasonable basis to think that the person to be detained "is committing or has committed a criminal offense." Arizona v. Johnson , 555 U.S. 323, 326, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). For the stop in this case to be legal under Terry , Van Wedding had to have reasonable suspicion that Defendant had a gun;[5] (2) that under the circumstances the detectives believed it necessary to pat the Defendant down prior to asking any questions, and (3) the gun was recovered incident to the pat down.
A reasonable basis requires more than a "hunch." Terry v. Ohio , 392 U.S. at 27, 88 S.Ct. 1868. Rather, it demands "specific and articulable facts which, taken together with rational inferences from those facts," id. at 21, 88 S.Ct. 1868, provide detaining officers with a "particularized and objective basis for suspecting wrongdoing," United States v. Arvizu , 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotation marks omitted). Far less stringent than the probable cause standard, Terry's "stop and frisk" standard requires only facts sufficient to give rise to a reasonable suspicion that criminal activity "may be afoot," and that the person stopped "may be armed and presently dangerous." Terry v. Ohio , 392 U.S. at 30, 88 S.Ct. 1868 (emphasis added); accord United States v. Arvizu , 534 U.S. at 273, 122 S.Ct. 744 (collecting cases).
Moreover, while a reviewing court cannot simply defer to police officers' judgment in assessing reasonable suspicion, the court must view the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene." United States v. Bayless , 201 F.3d 116, 133 (2d Cir. 2000) (internal quotation marks omitted).
So, did the police-in particular, Van Weddinger-have reasonable suspicion in this case?
Because of critical inconsistencies with the irrefutable video evidence, there is insufficient credible evidence to support any such finding, even under a preponderance of the evidence standard.
What Van Weddinger Might Have Seen and What He Did See
After exhaustively reviewing the video evidence, I find that there are three possible occasions between 12:15 PM and 12:28 PM at which the altercation described by Van Weddinger could have occurred.
First, Van Weddinger could have been describing the verbal dispute between Defendant and Ty, clearly visible on surveillance cameras that took place immediately after their fight, at about 12:15 PM. What makes this possible is that the two men unquestionably engaged in a verbal dispute at that time and place. Defendant insists that, if Van Weddinger saw anything at all, it had to be this encounter, because there was no other verbal dispute.
However, I conclude that this encounter, clearly depicted on the surveillance video, is not what Van Weddinger saw. There are many reasons why this is so: (1) the incident occurred at Eighth Avenue and West 151st Street, not at the corner of Eighth and West 150th Street; (2) at no point *485 during this altercation did Defendant have his arm tucked close to his side in the manner described by Van Weddinger; (3) Van Weddinger categorically denied seeing Defendant with his hand in his pocket, but the video surveillance tape clearly shows that Defendant had one hand in the pocket of his hoodie while he and Ty were yelling at one another; (4) at the conclusion of this incident, the two men walked south, not north, on Eighth Avenue; and (5) Ty walked south after Defendant, not vice versa.
In addition, I find it totally incredible that a police officer who saw something that he thought meant "trouble brewing" would wait for 17 minutes (from 12:15 until 12:32) to call for back up.
Second, something could have happened between Defendant and Ty after Defendant crossed over toward the east side of Eighth Avenue at 12:15:28. I examined this possibility because: (1) as he crosses Eighth Avenue, the video camera shows Defendant walking southeast, which means he was moving toward West 150th Street; and (2) approximately one minute later, at 12:16:14, (GX 4), Ty can be seen walking northwest out of the Eighth Avenue roadbed and turning north on Eighth. It is possible that he, too, might have crossed over to the east side of Eighth Avenue, and encountered Defendant there.
However, I reject this theory as well. In addition to the long period between when this would have to have taken place and when Van Weddinger called for back-up--almost as long as with the first possibility-an encounter on the east side of Eighth at 12:16 does not comport with another key element of Van Weddinger's testimony: the same surveillance camera that captured Ty coming up onto the sidewalk and turning north would have recorded Defendant if he followed Ty northbound on Eighth Avenue "a short time later"-- which Van Weddinger said meant two to three minutes. But Defendant did not follow Ty northbound within two or three minutes of 12:16 PM. Defendant did not walk north on Eighth Avenue into range of the surveillance cameras until 12:36:05 PM-about 20 minutes after Ty stepped out of the roadbed and walked north on Eighth.
I also reject this possibility because only 50 seconds passed between Ty's disappearance from the surveillance camera's range and his return. For this theory to work, Ty would have had to cross a wide major thoroughfare, get all the way to the corner of 150th Street and Eighth,[6] engage in a "heated argument" that lasted long enough to attract the attention of a detective who was driving southbound down the opposite side of the street, then cross back to the west side of the street and get almost all the way up the block to West 151st Street. Even at the speed with which people move on these videotapes, that is simply not possible.
So I am left with one more possibility.
Third, we know that Ty-after running west on West 151st Street at 12:25:36 PM-must have circled the block. We know this because he was walking north on Eighth Avenue between West 150 and West 151 at 12:28:40 (his feet can first be seen from the GX 3 surveillance camera at 12:28:35 PM, which means he was about halfway between 150th and 151st Streets at that point; he appears on GX 4 five seconds later). Assuming he ran three quarters of the way around the block at rapid clip, it is conceivable that Ty could have *486 encountered Defendant on or near the northwest corner of West 150th and Eighth Avenue-right outside of Defendant's grandfather's apartment-about a minute and a half after he left Erica and her friends on West 151st Street, or at around 12:27 PM.[7] The two men could have exchanged words at that time in sight of the officers, after which Ty proceeded north on Eighth Avenue and came into range of the surveillance cameras.[8]
This theory is the most plausible of the three for the following reasons: (1) the incident occurred at the location identified by Van Weddinger; (2) it occurred at a time when both men, given all the credible evidence (including credible portions of Defendant's statement and what can be inferred from the videotapes) were likely at or near the corner of West 150th and Eighth; (3) within a minute after the incident took place, Ty can be seen walking in the direction to which Van Weddinger testified-that is, north on Eighth Avenue; and (4) Defendant also headed north on Eighth Avenue, and he did not do so immediately.
Because I do believe that Van Weddinger saw Defendant and Ty arguing, I conclude, as a logical inference from the credible evidence, that Strachon and Ty continued their earlier fight on the corner of West 150th Street and Eighth Avenue at approximately 12:27 PM, and that Van Weddinger saw this from his car.
However, I cannot conclude, even by a preponderance of the evidence, that Van Weddinger had reasonable suspicion at that point that Strachon was carrying a gun.
"Reasonable suspicion is so fact-intensive that on-point precedent to control the outcome of a case will typically be nearly impossible to find." United States v. Jackson , No. 15-CR-106 JPO, 2015 WL 4557401, at *8 (S.D.N.Y. July 29, 2015), citing, Cf. Illinois v. Gates , 462 U.S. 213, 238 n. 11, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("There are so many variables in the probable cause equation that one determination will seldom be a useful 'precedent' for another.").
As a general rule, I recognize that an experienced police officer can have reason to conclude that some seemingly innocuous action-such as holding one's arm closely to one's side, an action that is otherwise consistent with trying to keep a completely legal object, like a pair of gloves, a package or a cell phone, from falling to the ground--might be an indicium of crime. See United States v. Padilla , 548 F.3d 179, 187-188 (2d Cir. 2008). That is so even though a civilian seeing the same thing contemporaneously-or a judge viewing the same behavior retrospectively-might not reach the same conclusion. Id.
But Van Weddinger's own behavior on December 17 indicates to me that he did not have anything more than a hunch about a gun after viewing the argument between Ty and Strachon. If an experienced detective-out for lunch without carrying the usual tools of police work (like handcuffs)-reasonably suspected that a man who was fighting on a street corner was carrying a gun and presented a danger to the community, I do not find it credible that he would defer calling for backup. Van Weddinger and Chow both testified to the importance of getting backup if an officer believes that a firearm is *487 involved, see Van Weddinger (Tr. 23), Chow (Tr. 61), yet Van Weddinger waited almost five minutes after seeing the fight before calling for backup. I thus conclude that, whatever Van Weddinger saw during the fight on the corner, it was not enough to cause him to conclude that he needed backup. I can only conclude that Van Weddinger had nothing more than a hunch-a good, experienced cop's hunch-that something might be amiss. After thinking about it, and possibly talking with his partner, he called for backup a few minutes later. As it turns out, his hunch was correct. But that is not the standard by which Terry stops are judged.
Furthermore, I conclude that Van Weddinger embellished his testimony with a demonstrably false detail-- which calls into question the credibility of his testimony about the position of Defendant's arm.
I acknowledge that it would have given rise to reasonable suspicion if Van Weddinger saw Defendant "briskly" following Ty up Eighth Avenue "a short time" after their heated argument-"a short time" meaning no more than two or three minutes after the fight. I accept that an experienced police officer with a hunch might well conclude, all of the above being true, that the man who just might have a gun was chasing the man with whom he argued. So had Van Weddinger actually seen Defendant following Ty "briskly" and in short order, it would have made perfect sense for him to place a call to Chow at 12:32 PM, asking for backup -- because he would have then had more than a hunch.
However, the surveillance cameras do not lie. What Van Weddinger claims to have seen did not happen. Strachon did not follow Ty north on Eighth Avenue at a brisk pace two or three minutes after their fight. Defendant is not seen on the most southerly of the surveillance cameras walking north on Eighth Avenue between 150th and 151st Streets until 12:36:05 PM (GX 3).[9] The credible evidence indicates that the second altercation between Ty and Defendant-the one on the corner of Eighth Avenue and West 150th Street-could only have occurred nine minutes earlier, at 12:27 PM. If Defendant were indeed walking "briskly" north on Eighth Avenue (as Van Weddinger testified) two to three minutes after Ty left the scene (as Van Weddinger testified), it would not have taken him more than 30-60 seconds to come within range of GX 3-around 12:31 or so. But Strachon did not come into view until five full minutes later, at 12:36 PM. There is nothing "brisk" about taking five or six minutes to walk a half a New York City block.
So Strachon did not walk north at a brisk pace two or three minutes after his encounter with Ty. It simply, provably, did not happen.[10]
I thus conclude that Van Weddinger embellished what he actually saw in order to justify his belated decision to call Chow for back up assistance-a call that was predicated on nothing more than a hunch, or it would have been placed immediately. And while I do believe that Van Weddinger saw a fight between Defendant and Ty-otherwise, he would not have called for backup at all-his demonstrably false testimony about the brisk walk north calls into question the credibility about Van Weddinger's *488 testimony that he saw Defendant holding his arm in what was, to him, a suspicious posture.
The Second Circuit's decision in United States v. Padilla 548 F.3d 179, 187-89 (2d Cir. 2008), lays out the type of factual showing the Court deemed sufficient to countenance a Terry stop, based on suspicion that a person was carrying a gun, when the officers never actually observed a weapon on defendant's person. In Padilla , reasonable suspicion for a Terry stop was established by a litany of seemingly innocuous facts that, in the totality of the circumstances, gave rise to reasonable suspicion in the mind of "a reasonable and cautious police officer on the scene, guided by his experience and training," Bayless , 201 F.3d at 133 (internal quotation marks omitted): a high-crime neighborhood; a skinny, disheveled man, whose appearance suggested drug use, being followed by two men down an otherwise deserted street; the fact that the two men were walking in an ostensibly suspicious manner; and the defendant's reaching under his jacket and shirt to adjust what appeared to be a weighty object. This combination of circumstances were sufficient to give rise to reasonable suspicion in the mind of the observing officer that the Defendant might be about to commit a drug-related robbery.
Here, by contrast, all we have is Van Weddinger's testimony that he saw two men engaged in a purely verbal and non-criminal altercation; that he thought Defendant "might possibly possess" a gun because of the position of his arm; and his demonstrably false testimony that the Defendant followed the man with whom he was fighting up the street in a manner that suggested he was going after the man-false testimony that casts doubt in my mind, as the factfinder, on the only testimony that could be used to support a finding of reasonable suspicion, which is Van Weddinger's testimony about the position of Defendant's arm. Not only are the "totality of the circumstances" far less than was the case in Padilla , but there is no indication in Padilla that there was any question in the court's mind about the credibility of the testimony given by the officer whose reasonable suspicion led to the Terry stop, as there is here.[11]
To the extent that Bonilla says he believes Van Weddinger saw a gun, that is irrelevant. The pertinent inquiry with respect to information transmitted by a fellow officer is "directed to the nature and reliability of the information possessed by the [officer] transmitting the information." Hoyos v. City of New York , 999 F.Supp.2d 375, 386 (E.D.N.Y. 2013), quoting, People v. Rosario , 78 N.Y.2d 583, 588-89, 578 N.Y.S.2d 454, 585 N.E.2d 766 (1991).
In the end, all we are left with is Van Weddinger's hunch-albeit a hunch informed by experience, and one that turned out to be correct. But all the experience in the world cannot make up for the lack of "specific and articulable facts," and turn a hunch into reasonable suspicion. See Terry v. Ohio , 392 U.S. at 27, 88 S.Ct. 1868. The Fourth Amendment cannot countenance unsupported hunches by our police, no matter how well intentioned their actions are.
*489 Strachon's seizure by the police and his subsequent search was not supported by probable cause or reasonable suspicion. His motion to suppress the physical evidence recovered from his person and his post-arrest statement is granted. See Wong Sun v. United States , 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (suppressing evidence of a crime where that evidence was discovered "by the exploitation" of an illegal seizure).
This constitutes the decision and order of the Court.

The surveillance videos from GX 2, 3 and 4 all start at 12:14:00 PM, Eastern Standard Time. However, the videos treat 12:14 PM as "zero" and record the passage of time, rather than the hour and minute -- so, for example, 12:15 PM is seen as "1:00" on GX 2. I have converted all times to Eastern Standard Time.

We of course know, from watching the video surveillance, that Ty never left "the vicinity" - he would have been within sight of Defendant for about 40 seconds and then spent the next 9 minutes on West 151st Street with Erica, Mike and Day Day. However, if Defendant were standing on the East side of Eighth Avenue, Ty would have disappeared from his view once he rounded the corner of West 151st Street and Eighth Avenue-which, per the surveillance video, happened at 12:16 PM.

Not only is Bonilla's story entirely at odds with the testimony of the other two officers, but Bonilla also told a third, entirely different story when he swore out the criminal complaint in this case. There he said that Van Weddinger had said that Defendant was "menacing individuals" and that he had seen the butt of a firearm in "Strachon's right hand right jacket pocket." (Tr. 90-91). Van Weddinger never said any of that. Bonilla testified similarly in the grand jury (Tr. 108-110). Bonilla's grand jury testimony was not true.

At another point in his testimony, Bonilla claims to have said, "Police" a second or two before he reached Strachon (Tr. 105). Applying the doctrine of falsis in unum, falsis in omnium , I do not credit this testimony. It is apparent from GX 5 that he said something to Strachon after he grabbed him; I find that that is when he identified himself.

Van Wedding is the relevant person because the other officers only knew what he told them; they had no independent reason to think that Defendant had a gun.

No one asked Van Weddinger on which of the four comers of 150th and Eighth Avenue the "heated argument" occurred. However, as the two police officers were driving back from lunch, they would logically have been driving south on Eighth, so they were closer to the west side of the street.

It could not have been earlier, because we know that Ty started to run around the block at 12:25:36 PM. And it could not have been later, because we know Ty was halfway up the west side of Eighth Avenue between 150th Street and 151st Street by 12:28:35.

We know for certain that nothing happened between Ty and Defendant between 12:16 PM and 12:25 PM, because Ty was on the corner talking to Mike, Day Day and Erica that entire time and Defendant is nowhere to be seen.

This camera picks up at about the mid-block between West 150 and West 151 on the west side of Eighth Avenue.

It is significant that neither of the other officers testified about hearing Van Weddinger say that the man he suspected of having a gun had taken off after the man with whom he was fighting. The detail has such significance to the reasonable suspicion analysis that one would have expected it to be conveyed to the other officers. There is no evidence that it was mentioned in either the first or the second cell phone call.

Indeed, a lack of candor by all of the detectives in this case-Van Weddinger about Strachon's chasing after Ty and his selective "amnesia" about his CCRB disciplinary record; Chow's dubious testimony about seeing the gun in Strachon's pocket when Bonilla had Strachon on the ground; Bonilla's testimony about Van Weddinger saying he saw a gun in Strachon's right jacket pocket and that Strachon was menacing several individuals (none of which was true, although all of it made its way into the criminal complaint)-has made it impossible to figure out exactly what caused the detectives to engage in their encounter with Strachon.